**KOENIG & BAUER–ALBERT AG, et al., Plaintiff,**

v.

**UNITED STATES, Defendant,**

**and**

**Goss Graphics, Inc., Defendant– Intervenor.**

**Slip Op. 98–83.**
**Court No. 96–10–02298.**

United States Court of International Trade.

June 23, 1998.

See also, 986 F.Supp. 1428.

Shearman & Sterling, Washington, DC (Thomas B. Wilner, Jeffrey M. Winton, Michael J. Chapman), for Plaintiffs MAN Roland Druckmaschinen AG and MAN Roland Inc.; Kirkland & Ellis, Washington, DC (Kenneth G. Weigel, Carol A. Rafferty, Nancy Kao) for Plaintiffs Koenig & Bauer–Albert AG and KBA–Motter Corp.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Boguslawa B. Thoemmes, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, and Randi–Sue Rimerman, Attorney, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendants.

Wiley, Rein & Fielding, Washington, DC (Charles Owen Verrill, Jr., Alan H. Price, and Willis S. Martyn III) for Defendant–Intervenors.

## OPINION

POGUE, Judge.

Plaintiffs Koenig & Bauer–Albert AG ("KBA") and MAN Roland Druckmaschinen AG and MAN Roland Inc. ("MAN Roland"), respondents in the underlying investigation, and Plaintiff Goss Graphic Systems, Inc. ("Goss"), petitioner in the underlying investigation, filed separate motions challenging various aspects of the determination of the International Trade Administration of the United States Department of Commerce ("Commerce" or "ITA") regarding imports of large newspaper printing presses ("LNPP") from Germany. *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany,* 61 Fed.Reg. 38,166 (Dep't Commerce 1996) (final det.)("Germany Final"). The motions were consolidated.

The antidumping investigation of LNPPs from Germany was conducted simultaneously with Commerce's investigation of sales of LNPPs from Japan. Issues common to both investigations were discussed in Germany Final. The Court affirmed Commerce's determinations with respect to common issues of scope and standing. *Mitsubishi Heavy Indus. v. United States,* 986 F.Supp. 1428 (1997). Familiarity with the Court's opinion on scope and standing issues is presumed.

MAN Roland challenges Commerce's refusal to accept amendments to the contract prices of two presses; Commerce's circumstance of sale adjustment for imputed credit expenses; Commerce's allocation of indirect selling expenses incurred by MAN Roland's U.S. subsidiary, MRU; Commerce's decision to rely on facts available in lieu of cost data supplied by MAN Roland; Commerce's choice of facts available; Commerce's choice of a variance to adjust MAN Roland's estimated overhead expenses to approximate actual expenses; Commerce's refusal to average MAN Roland's costs with those of MAN Roland's wholly owned subsidiary; Com-

merce's decision to include home-market sales with "abnormally high profits" in its profit calculation for constructed value; Commerce's treatment of certain U.S. sales as constructed export price ("CEP") sales; and Commerce's decision to treat MAN Roland's installation costs as further manufacturing costs. *See* Mem. Pls. MAN Roland Druckmaschinen AG and MAN Roland Inc. Support Mot. J. Agency Record Company- and Country–Specific Issues at 3–4 ("MAN Roland brief").

Goss challenges four aspects of Commerce's final determination. Two of Goss's objections, regarding Commerce's decision to deduct imputed interest from normal value and Commerce's allocation of indirect selling expenses incurred in Germany and Japan, are common to both the German and the Japan investigations. These are discussed in *Mitsubishi Heavy Indus. v. United States,* slip op. 98–82, 1998 WL 417423, 15 F.Supp. 807 (CIT June 23, 1998).

With regard to the Germany investigation, Goss objects to Commerce's allocation of costs for two of MAN Roland's U.S. sales, and Commerce's inclusion of Canadian warranty expenses in estimating MAN Roland's U.S. warranty expenses. Brief Support Goss Graphic Sys., Inc. Rule 56.2 Mot. J. Agency Record Comp./Country Specific Issues ("Goss brief").

KBA challenges Commerce's choice of facts available in calculating its dumping margin. *See* Brief of Pls. Koenig & BauerAlbert AG and KBA–Motter Corp. Support Mot. J. Agency Record (KBA brief).

## DISCUSSION

### I. MAN ROLAND'S PRICE AMENDMENTS

Commerce calculated MAN Roland's dumping margin based on sales of two complete Geoman presses[1], to *The Rochester Chronicle and Democrat* ("Rochester") and *The Times Leader* of Wilkes Barre ("Wilkes Barre") and two sales of German components for U.S.-made presses or additions. A fifth sale, of parts and subcomponents, was excluded from Commerce's final analysis be-

1. Geoman is the name of one of the LNPP mod- els produced by MAN Roland.

cause Commerce determined that it was outside the scope of its investigation. *See* Germany Final at 38,172.

Several months after Goss filed its antidumping petition, MAN Roland amended its contracts for the Rochester and Wilkes–Barre presses. In the final determination, Commerce refused to accept the price adjustments and calculated U.S. price based on the original contract prices of the two sales. MAN Roland challenges this decision.

■ According to the statute, United States price is to be based on "the price at which the subject merchandise is first sold (or agreed to be sold)" to an unaffiliated purchaser in the United States. 19 U.S.C. § 1677a(a), (b) (1994). The statute does not discuss the treatment of price amendments made after the period of investigation. Therefore, the Court must defer to Commerce's interpretation of the statute if that interpretation is reasonable. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If, ... the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute,.... Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.") (footnotes omitted); *see also Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed.Cir. 1994) ("[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another.").

MAN Roland argues that Commerce's refusal to accept the price amendments was inappropriate because "[t]here was no evidence in this case that the prices were being manipulated to avoid a dumping finding." *MAN Roland brief* at 5. However, MAN Roland's implicit statement of the relevant legal standard is inaccurate. Commerce was not looking for evidence of manipulation. Commerce's rejection of the price amendments was based upon the *potential* for manipulation, not evidence of actual manipulation.

In past cases, the Department [Commerce] has stated that its standard practice is not to accept price adjustments instituted after the filing of a petition.... [W]e have held that we are cautious in accepting price increases ... so as to discourage potential manipulation of potential dumping margins, and have determined the original contract price which pre-dated the filing of the petition as the proper basis for U.S. price.
Germany Final at 38,181.

Commerce's decision to reject price amendments that present the potential for price manipulation was a permissible interpretation of the statute. *See Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 1046, 700 F.Supp. 538, 555 (1988) ("The ITA has been vested with authority to administer the antidumping laws in accordance with the legislative intent. To this end, the ITA has a certain amount of discretion [to act] ... with the purpose in mind of preventing the intentional evasion or circumvention of the antidumping duty law."), *aff'd* 8 Fed. Cir. (T) 45, 898 F.2d 1577 (1990); *see also Dastech Int'l, Inc. v. ITC*, 21 CIT ——, 963 F.Supp. 1220, 1229 (1997) ("Post-petition pricing changes may be suspect because of the possibility of posturing to promote the outcome a party desires.").

Commerce's decision also was supported by substantial evidence. The price amendments themselves, made after the initiation of the investigation, constitute evidence that manipulation may occur, as does the fact that Commerce was unable to verify the amendments. *See* Def.'s Mem. Opp. Mot. MAN Roland Druckmaschinen AG and MAN Roland Inc. J. Agency Record Country and Company–Specific Issues at 7–8 ("Commerce brief") ("ITA could not conclude that MRD's amendment was *bona fide*, where the amendment pertained to a contract in connection with an unfinished press, the payment of which would not occur (and, thus, could not be verified) until after the investigation had ended.").

MAN Roland also argues that because "there was no factual basis for concluding that the price amendments at issue ... were in any way fictitious or manipulated ... the Department's determination can only be sus-

tained if there is, in fact, a *per se* rule requiring the Department to automatically disregard any prices negotiated after the petition was filed." MAN Roland brief at 7. MAN Roland concludes that Commerce does not operate under such a rule and therefore, Commerce erred in excluding the post-petition price amendments.[2]

MAN Roland is mistaken. The Court need not find that Commerce has a per se rule in order to uphold its decision. As explained above, Commerce's rejection of MAN Roland's price amendments was in accordance with law and supported by substantial evidence. Therefore, the Court will not disturb Commerce's decision. *See* 19 U.S.C. § 1516a(b)(1) ("The court shall hold unlawful any determination, ... found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law....").

## II. IMPUTED INTEREST EXPENSE

In calculating both normal value and U.S. price, Commerce made a circumstance-of-sale adjustment for imputed interest expenses incurred during production of the subject merchandise. Commerce's usual imputed interest calculation is based only on the cost of financing receivables between shipment date and payment date. *See* Germany Final at 38,187.

■ MAN Roland contends that Commerce should have treated imputed interest expense incurred prior to shipment as a cost of production. Commerce chose to treat the imputed interest as a circumstance of sale, MAN Roland argues, only because the stat-

ute would not permit Commerce to deduct imputed interest from the cost of production. "[U]nder both German and U.S. accounting principles, capitalized interest could not have been included in the cost of MAN Roland's LNPPs. And, because the statute incorporates those accounting principles, capitalized interest could not have been included in the constructed value...." MAN Roland brief at 10–11. Commerce does not dispute MAN Roland's assertion that German generally accepted accounting principles ("GAAP") would not allow imputed interest to be included in cost of production. Furthermore, in some instances, Commerce is required to calculate costs "based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country ... and reasonably reflect the costs associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A). However, that requirement does not apply to the circumstance of sale provision. *See id.* Thus, the issue here is whether Commerce had the discretion to treat the imputed interest expense as a circumstance of sale rather than part of the cost of production.

■ The statute requires that constructed value be "increased or decreased by the amount of any difference ... between the [U.S. price] and [constructed value] ... that is established to the satisfaction of the administering authority to be wholly or partly due to ... differences in circumstances of sale." 19 U.S.C. § 1677b(a)(6)(C). The statute does not define the term circumstance of

**2.** As evidence that Commerce has no *"per se* rule"* regarding price amendments, MAN Roland cites Commerce's regulation that any sales that occur during the month in which a petition is filed will normally be included in Commerce's investigation. 19 C.F.R. § 353.42(b)(1). Thus, MAN Roland argues, "in every case in which the petition is filed before the end of the month, the Department routinely considers sales that were negotiated after the citation was filed." MAN Roland brief at 7. Similarly, MAN Roland argues, Commerce routinely uses post-petition prices when carrying out administrative reviews of antidumping duty orders.

The Court is not persuaded by either of MAN Roland's examples. The Commerce regulation involves sales made during a limited period of

time, between the date a petition is filed and the end of the month in which that petition is filed. This case involves a price amendment made several months after the end of the period of investigation. MAN Roland's administrative review reference is equally inapposite because the purpose of an administrative review is different from that of an antidumping investigation. The purpose of an investigation is to determine whether dumping has occurred in the past and to calculate an estimated margin to be deposited on future entries. The purpose of the administrative review is to assess actual dumping duties, giving the parties, annually, an opportunity to adjust prices so that unfair pricing, and dumping duties, can be avoided. *See* 19 U.S.C. § 1675 (1994).

sale. Thus, Commerce has broad discretion in determining what constitutes a circumstance of sale. *See Sawhill Tubular Div. Cyclops Corp. v. United States,* 11 CIT 491, 497, 666 F.Supp. 1550, 1555 (1987) ("It is . . . clear that Congress had deferred to the expertise of the agency and vested broad discretion in it to make adjustments for the differences in the circumstances of sale."). That discretion, however, is limited. "One recognized limitation upon this power is that adjustment be made for those factors and conditions which have a direct bearing on or relationship to the sales under consideration." *Id.*

In the final determination, Commerce explained,

> We believe that it is appropriate in this instance to recognize the comprehensive financing arrangement for each sale as a circumstance of sale adjustment. LNPPs require substantial capital expenditures over an extended time period because of their size and lengthy production process. . . . Moreover, the projects generally call for the purchaser to provide scheduled progress payments before completion of a project. Our normal imputed credit calculation . . . does not measure the effect of progress payments made relative to production costs incurred. To adjust sales prices for the effect of the respondent incurring significant capital outlays at the beginning of a project . . . or receiving large sums of money up front . . . we calculated imputed credit for each home market and U.S. sale. . . .

61 Fed.Reg. at 38,187. Commerce calculated imputed interest by subtracting progress payments from capital outlays made during the construction period and then multiplying the balance by the applicable interest rate. *See* Mem. Re: Constructed Value, Further Manufacturing and Constructed Export Price Adjustments for Final Determination, N–P Doc. 107 at 4. Commerce's treatment of the imputed interest as a circumstance of sale allowed it to fully recognize the complexity of the financing arrangements at issue here. Given that construction on a single sale in this case may take several years to complete, as well as the fact that financing arrangements may vary widely from sale to sale, the Court finds Commerce's decision to treat the imputed interest expenses as a circumstance of sale was reasonable.

MAN Roland argues that Commerce's actions here were inconsistent with its actions in *Zenith Elec. Corp. v. United States,* 18 CIT 870 (1994). In *Zenith,* Commerce made a circumstance of sale adjustment for respondent's imputed credit expense. However, Commerce refused to offset the imputed credit expense—based on "the average duration of accounts receivable,"—by "the average duration of accounts payable." *Id.* at 875. Commerce explained,

> by allowing the customer a period of time to pay, the seller effectively reduces the sales price of the merchandise because of the time value of money. . . . To the extent that a manufacturer can delay paying its suppliers, the cost of materials is reduced by the time value of money, resulting in a saving in the cost of production. Since accounts payable are, thus, production costs, they cannot result in a circumstance-of-sale adjustment.

*Id.* at 875, n. 8. Commerce explained further, that it could not treat accounts payable as a circumstance of sale adjustment because doing so "would require us to adjust for factors relating to cost of production, which are unrelated to the *sales* at issue." *Id.* In this case, unlike *Zenith,* Commerce made the imputed interest adjustment to compensate for different payment schedules by customers to respondent. Thus, the adjustment was related directly to the sales at issue and appropriately treated as a circumstance of sale.

### III. ALLOCATION OF INDIRECT SELLING EXPENSES

In calculating United States indirect selling expenses for MAN Roland's affiliated agent in the United States, MRU, Commerce divided total United States indirect selling expenses incurred on sales of LNPPs during the period of investigation, by the value of United States sales realized—i.e., shipped and invoiced—during the same period. This rate was applied to the subject sales (sales made but not necessarily realized during the

period of investigation) [3] to compute the indirect selling expenses attributable to each such sale.

MAN Roland argues that Commerce's methodology overstated MAN Roland's indirect selling expenses. Just prior to the period of investigation, MAN Roland explains, the LNPP industry experienced a period of depressed sales. Because MAN Roland had a below-average number of sales made just *before* the period of investigation, it had a below-average number of sales realized *during* the period of investigation. MAN Roland brief at 15. MAN Roland's period of sales depression ended at the end of 1993, so that during the period of investigation, which lasted from July 1993 to June 1995, MAN Roland's sales made returned to normal levels. *Id.*

> The great difference between the value of the orders [sales made] MAN Roland received during the period and the value of the shipments [sales realized] ... during the same period resulted in a serious distortion in the Department's calculation of the indirect selling expense adjustment. In simple terms, the Department took the indirect selling expenses incurred by MRU during the two-year period and divided them by the very low level of *shipments* during the period to calculate a very high indirect selling expense rate. It then applied this high expense rate to the high level of sales *ordered* during the period.

*Id.* at 15–16.

MAN Roland contends that in calculating the indirect selling expense rate, Commerce should have divided total indirect selling expenses by the value of sales made during the period of investigation, rather than by the value of sales realized. "As a matter of simple arithmetic, the denominator used to calculate an expense rate must be determined on the same basis as the figures to which the rate will be applied." *Id.* at 16.

The statute requires that Commerce deduct from CEP all selling expenses, including indirect selling expenses, defined as "any selling expenses" not deducted as commissions, direct selling expenses, or selling expenses that the seller pays upon behalf of the purchaser. 19 U.S.C. § 1677a(d)(1)(D). According to the Statement of Administrative Action to the URAA, indirect selling expenses are expenses that "would be incurred by the seller regardless of whether the particular sales in question are made, but reasonably may be attributed (at least in part) to such sales." H.R. Doc. No. 103–316 at 824 (1994) ("SAA").[4] Neither the statute nor the SAA explains how indirect selling expenses are to be allocated. Therefore, the Court must accept Commerce's methodology if that methodology is reasonable.

In order to calculate an allocation ratio for indirect selling expenses, Commerce needed to divide MAN Roland's total indirect selling expenses for the period of investigation, by the total value of the sales for which those expenses were incurred. However, indirect selling expenses cannot be tied to specific sales, so Commerce had to choose an appropriate pool of sales to serve as a denominator. Commerce normally calculates the indirect selling expense ratio by dividing indirect selling expenses by the sales revenue realized during the period of investigation. Preliminary Det. Concurrence Mem., N–P Doc. 70 at 10–12 ("Concurrence Mem."). The decision to do so here was within Commerce's

---

**3.** Commerce bases the date of sale on the date when all the essential terms (*i.e.,* price and quantity) are firmly established and no longer within the control of the parties to alter without penalty. *See* Germany Final at 38,182. Because of the length of the production process for LNPPs, an LNPP sold during the period of investigation might not be shipped until several years later.

**4.** The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements...." H.R. Doc. No. 103–316 at 656 (1994). "It is the expectation of the

Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." *Id.* (quoted in *Delverde, SrL v. United States,* 21 CIT ——, 989 F.Supp. 218, 230 n. 18 (1997)). *See also* 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress ... shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.")

discretion and in accordance with law. Sales revenue realized represents a verifiable pool of sales for which expenses have actually been incurred.

MAN Roland also argues that Commerce's allocation methodology was inconsistent with *Sweaters from Taiwan,* 55 Fed.Reg. 34,585, 34,596 (Dep't Commerce 1990)(final det.). In that case, Commerce declined to allocate indirect selling expenses over sales realized and instead allocated them over purchase orders received (sales made). However, in *Sweaters from Taiwan,* Commerce found a correlation between the indirect expenses incurred during the period of investigation and the sales ordered during the investigation. *See id.* at 34,596 ("The Department has determined that it is most appropriate to allocate selling expenses over the value of sales for which such expenses were incurred."); *see also* Concurrence Mem. at 12 ("In *Sweaters from Taiwan,* there was a close correlation between POI sales orders and POI selling expenses.").

In this case, MAN Roland has provided no evidence to indicate that a correlation exists between the sales ordered during the period of investigation and the indirect selling expenses incurred during that period. Furthermore, Commerce found that for LNPPs, "sales efforts last for years and yield only large sales at irregular intervals. . . ." Germany Final at 38,183; *see also* Concurrence Mem. at 12 ("In the LNPP industry due to the significant lead time involved among the different phases of the sales process (*i.e.,* sales negotiation, sales contract, production, shipment and the receipt of sales revenue for accounting purposes), such correlation does not exist.").

For the above reasons, the Court finds, Commerce's allocation of MRU's indirect selling expenses was consistent with its previous determinations, supported by substantial evidence, and in accordance with law.

### IV. CONSTRUCTED VALUE ISSUES FOR MAN ROLAND

#### 1. *Commerce's Rejection of MAN Roland's Submitted Cost Data*

 In calculating normal value for the subject sales, Commerce relied on construct-

ed value, pursuant to 19 U.S.C. § 1677b(4). During the investigation, MAN Roland requested that, for purposes of the preliminary determination, Commerce accept projected costs of production for the Wilkes–Barre and Rochester presses because they were still in the production process, and actual costs were not yet available. Commerce normally accepts only actual costs of producing subject merchandise. Germany Final at 38,186.

The cost accounting system used by MAN Roland to generate cost projections for the two presses, the ADK system, was described by MAN Roland as follows:

[t]o produce a press, MAN Roland must produce a project-specific bill of materials that specifies the materials to be used in the production and provides detailed work instructions for the workers involved in the production. MAN Roland has a "project specific standard costing system" (the "ADK" system) which can calculate costs precisely based on those detailed work instructions. The ADK system calculates standard costs based on the project-specific bill of materials by (1) valuing materials based on actual prices for the materials and (2) valuing labor by multiplying the standard labor time for each production operation by the actual wage rate of the worker responsible for performing the operation.

MAN Roland brief at 21–22.

In its decision to include the two U.S. sales, despite the fact that they would not be completed by the date of the preliminary determination, Commerce "relied on MAN Roland's representations that project-specific standard costs . . . would be available for use in the preliminary determination, and that we would be able to compare these costs against substantial actual costs at verification and adjust them accordingly." Sales Exclusion Mem., N–P Doc. 68 at 4.

In the final determination, Commerce rejected MAN Roland's projected costs and relied on information available to calculate CV for the incomplete presses.

MAN Roland objects to Commerce's rejection of its submitted CV information. MAN Roland argues that "[a]t bottom, the Depart-

ment decided to reject the costs generated [by MAN Roland's standard costing system] because those costs were not verified. But the fault in that regard was not MAN Roland's. Those costs were accurate and fully verifiable." MAN Roland Brief at 23. MAN Roland suggests two methods by which Commerce could have verified the costs generated by its cost accounting system. "[T]he Department could have compared the actual costs and the [projected] costs for similar presses produced for the home market.... Alternatively, the Department could have compared 'the reported costs to the actual costs for the completed elements of the presses at verification.'" *Id.* at 25 (citing Feb. 23 Mem. from team to Richard Moreland re: sales exclusion issues at 4, N–P Doc. 68). However, MAN Roland contends, "[t]he Department's verifier simply refused to examine this information. Apparently believing (incorrectly) that the [projected] costs were subject to manipulation because they had been generated after the initiation of the case, she refused to look further." *Id.* at 26.

"Congress has afforded ITA a degree of latitude in implementing its verification procedures." *Floral Trade Council v. United States,* 17 CIT 392, 399, 822 F.Supp. 766, 772 (1993). "The decision to select a particular method of verification rests solely within the agency's sound discretion.... If a reasonable standard is applied and the verification is supported by substantial evidence, the court will sustain the methodology." *Id.* (citing *Hercules, Inc. v. United States,* 11 CIT 710, 726, 673 F.Supp. 454, 469 (1987)).

■ In this case, Commerce verifiers conducted a physical inspection of MAN Roland's production plant and reviewed source documents to verify MAN Roland's questionnaire responses for numerous elements necessary to calculate constructed value. *See* Mem. Re: Verification of Constructed value ("CV") and Further Manufacturing ("FM") Data, May 16, 1996, N–P Doc. 95 ("Cost Verification Report"). The documents examined by Commerce included MAN Roland's work-in-process ("WIP") inventory, where MAN Roland records production costs during the manufacturing phase; MAN Roland's work orders for individual presses; and

MAN Roland's audited financial statements, which Commerce reconciled with the WIP inventory. *Id.*

Based on the description above, excerpted from Commerce's verification memorandum, the Court finds, Commerce's verification procedures were reasonable and adequate and therefore, in accordance with law. *See Floral Trade Council,* 17 CIT at 399, 822 F.Supp. at 772 (finding Commerce's verification to be adequate where Commerce "conduct[ed] a physical inspection of [respondent's] production areas, and [reviewed] source documents....").

■ Furthermore, Commerce's decision to reject MAN Roland's projected costs was supported by substantial evidence. At verification, Commerce discovered that although MAN Roland prepares a project-specific bill of materials for each LNPP,

> in the normal course of business, MRD does not prepare project-specific standard workplans [i.e., apply the ADK system] for each LNPP that it manufactures. According to company officials, the detailed, project-specific workplans are only prepared for new press models or for presses with unique or special features. MRD officials also indicated that the workplans for the Rochester and Wilkes–Barre projects had been prepared ... solely for the purpose of providing CV information in this case.

CV Verification Report at 2. The fact that these costs were generated specifically for purposes of the investigation supports Commerce's conclusion that the submitted costs were not independently reliable. *See* SAA at 834–35 ("In determining whether a company's records reasonably reflect costs, ... Commerce ... will consider whether the producer historically used its submitted cost allocation methods to compute the cost of the subject merchandise prior to the investigation ... and in the normal course of its business operation."). In addition, Commerce's verifier found that MAN Roland does not reconcile actual costs recorded in its WIP inventory, to the estimated costs in its project-specific workplan.

Thus, company officials could not identify for us those parts of the Rochester and

Wilkes–Barre presses that had been completed as of December 31, 1995 (and for which actual cost data could be reported) and those that remained unfinished as of that date (and would therefore require costs to be reported based on the project-specific standard workplan).... Although MRD reported that the Rochester and Wilkes–Barre sales were 60 and 81 percent complete, respectively, ... these figures were based on a comparison of project costs recorded in the company's WIP inventory account to total standard workplans. Thus, ... MRD did not report actual costs incurred to date for the specific projects. Rather, the reported COP and CV figures for these projects were based solely on costs from the company's standard work plans,....

Cost Verification Report at 2–3. Commerce's determination, that it was unable to verify MAN Roland's submitted cost data was in accordance with law and supported by substantial evidence. Therefore, the Court finds, Commerce's decision to rely on information available was appropriate. *See* 19 U.S.C. § 1677e.

### 2. *Commerce's Choice of Facts Available*

Rather than relying upon MAN Roland's submitted costs, Commerce used, as facts available, the original estimated costs submitted by MAN Roland, adjusted for the difference, or variance, between estimated and actual costs for a single home market sale designated as HM4. N–P Doc. 107 at worksheet 4.

MAN Roland argues that Commerce's decision to adjust MAN Roland's estimated costs based on the variance of a single sale was arbitrary and impermissibly inflated MAN Roland's costs.

■ Commerce is authorized to use the facts available if "an interested party or any other person ... provides ... information but the information cannot be verified...." 19 U.S.C. § 1677e(a)(2)(D). The statute does not define facts available, thus Congress has left the choice of facts to Commerce's discretion. According to the SAA, Commerce need not "prove that the facts available are the best alternative information. Rather, the

facts available are information or inferences which are reasonable to use under the circumstances." SAA at 869. The relevant case law, requires that the choice of facts available bear a rational relationship to the subject matter at issue. *See Manifattura Emmepi S.p.A. v. United States,* 16 CIT 619, 624, 799 F.Supp. 110, 115 (1992)("[Commerce's] authority to select best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply.").

■ In this case, Commerce used cost estimates that MAN Roland prepares for every press at the time the customer signs the final agreement. Cost Verification Report at 8. The cost estimates submitted for the Rochester and Wilkes–Barre sales were prepared by MAN Roland in the ordinary course of business, prior to the initiation of this case. Germany Final at 38,186. These cost estimates were adjusted using the actual variance for a contemporaneous home market sale of the same model press. *Id.* at 38,186–87. Thus, the Court finds, Commerce's choice of facts available bore a rational relationship to the actual costs of the presses at issue.

■ MAN Roland states that Commerce received information on all of MAN Roland's completed LNPP projects since 1990 and that Commerce should have based its analysis on evidence provided for all of these sales rather than a single one. MAN Roland Brief at 26–27. However, as Commerce explained, it chose a single sale, HM4 because it was the only "fully-completed Geoman sale for which ITA had both detailed cost estimate sheets and actual costs from MRD's cost accounting system." N–P Doc. 39, at App. 17. The detailed cost estimate sheets were necessary, Commerce explains, because they "provided the information necessary to subtract costs included in the total estimate from actual costs incurred for completed projects." Commerce brief at 29 n. 17. Furthermore, it was reasonable for Commerce to rely only on completed press sales. MAN Roland estimated costs for complete projects. Commerce needed to compare MAN Roland's estimates with actual costs in order to estab-

lish the variance between estimated costs and actual costs. Commerce would not make this comparison using incomplete projects because the actual cost figures for such projects also would be incomplete. Therefore, Commerce would not know which part of the estimate to compare to the available actual costs. Thus, Commerce's decision to rely on variance information from a single sale was reasonable.

Commerce's choice also was supported by substantial evidence. MAN Roland argues that HM6 was scheduled to be completed during the POI, and that Commerce's failure to use information related to this sale as well as the HM4 information was the result of "a simple misreading of the percentage completion schedule submitted on March 13, 1996 by MAN Roland." MAN Roland brief at 28. According to that schedule, which lists both the WIP balance and the percentage complete for each press as of September 30, 1995 and as of December 31, 1995, the figures given for HM6 are based on actual rather than estimated costs. The fact that actual costs were available for HM6, MAN Roland argues, indicates that the press must have been complete at the time MAN Roland submitted the schedule. However, the schedule also indicates that as of December 31, 1995, HM6 was only 85.21 percent complete. Thus, Commerce had substantial evidence

indicating that HM4 was the only home-market Geoman press for which it had complete cost information.

### 3. Overhead Variance Adjustment

In its normal cost accounting system, MAN Roland calculates estimated overhead costs for each project by multiplying the direct labor costs for the project by fixed percentages. These percentages are not adjusted for projected or actual levels of activity in the factory. As a result, during periods when the factory is operating at high levels and direct labor costs increase, the estimated overhead costs also increase. However, *actual* overhead costs do not increase. Thus, when MAN Roland operates its production facilities at high levels, the estimated overhead costs overstate the actual overhead costs.[5] MAN Roland brief at 29.

■■■ MAN Roland's Rochester and Wilkes–Barre presses were not completely manufactured as of December 1, 1995, the cut-off date for MAN Roland's submissions to Commerce. In reporting the estimated cost of production for the incomplete presses, MAN Roland based its overhead variance on its first quarter results[6] for fiscal year 1996 (July 1, 1995—June 30, 1996) and its budgeted fiscal year 1996 variance.

5. The level of direct labor costs depends heavily on the level of activity. Direct labor costs are wages paid to production workers. If those workers work additional hours because production is higher, the direct labor costs increase. Overhead includes expenses such as deprecation, rent, lighting and heating that do not vary directly with production.

6. MAN Roland attempted to submit evidence regarding its actual operations level and variance for the first six months of fiscal year 1996 on March 13, 1996, but Commerce refused to accept the submission. MAN Roland brief at 31 n. 42. MAN Roland argues that Commerce's refusal to accept the information was contrary to its regulations, because "[t]he regulations provide that a party may submit new information at any time up to one week before the start of verification." *Id.* (citing 19 C.F.R. § 353.31(a)(1)(i)). However, Commerce explains, "ITA did not ... reject MRD's submission pursuant to section 353.31(a)(1)(i). Rather, ITA rejected the submission because it constituted a disguised 'resubmission' of MRD's previously-submitted Section D

Response.... The determination of deadlines for questionnaire responses is fully within ITA's discretion." Commerce brief at 32 n. 18 (citing 19 C.F.R. § 353.31(b)(2)). Commerce's explanation is reasonable. Commerce requested MAN Roland's variance information in its Section D Questionnaire and MAN Roland responded to that request. Commerce was under no obligation to accept additional information, submitted in response to the same request, after the questionnaire-response deadline had passed. *See Usinor Sacilor v. United States*, 18 CIT 1155, 1163–64, 872 F.Supp. 1000, 1008 (1994) ("Commerce has discretion to set time limits for the submission of a questionnaire response or other factual information requested.... Because Commerce must complete the investigation within strict statutory time limits, it is imperative that the requested information be submitted 'within a period that allows Commerce sufficient time for adequate analysis and comment while still meeting statutory deadlines.' ... Thus, in general, the court has affirmed Commerce's rejection of corrections submitted after the deadline.") (citations omitted).

**848**

Commerce rejected MAN Roland's adjustment and applied the actual variance from MAN Roland's most recently completed fiscal year, July 1, 1994—June 30, 1995. Germany Final at 38,187.

 MAN Roland contends that, "[t]he actual variances from past years did not provide an accurate measure of the variance for the 1995–96 period, ... " Brief of Pls. MAN Roland Druckmaschinen AG and MAN Roland Inc. Reply to Def.'s and Goss Graphics Systems, Inc.'s Resp. Briefs on Comp.- and Country-specific issues at 14 ("MAN Roland Reply brief"), and that "[t]he rationale offered by the department is ... completely without merit and totally unsupported by evidence on the record." MAN Roland brief at 31.

 Constructed value is defined in relevant part, as, "an amount equal to the sum of—(1) the cost of materials and fabrication or other processing of any kind employed in producing the merchandise ... (2)(A) the actual amounts incurred and realized by the specific exporter or producer ... for selling, general and administrative expenses, and for profits, . . . ." 19 U.S.C. § 1677b(e). Thus Congress has allowed Commerce a certain degree of discretion in choosing specific methodologies for calculating elements of CV such as overhead. Here, Commerce explained:

> MRD's budgeted variances do not accurately predict full-year operating results and rely on unrealistic capacity utilization levels. In addition, year-end adjustments or one-time annual costs may not be reflected in the partyear actual variance. Therefore, we rejected MRD's reported part-year actual variance and budgeted fiscal year variance calculation for fiscal 1996.

Germany Final at 38,187. Commerce's decision to reject MAN Roland's submitted variance was a reasonable application of the constructed value provision. The purpose of the antidumping scheme is to allow Commerce to calculate dumping margins as accurately as possible. *See Rhone Poulenc v. United States,* 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1191 (1990) (stating that "the basic purpose of the statute," is "determining current margins as accurately as possible.") Thus, it is within Commerce's discretion to reject submitted information that may not accurately reflect actual costs. Furthermore, Commerce's decision was consistent with Commerce's longstanding preference for using actual rather than estimated costs. *See supra,* pp. 843–844. Commerce has the discretion to weigh the relative value of record evidence. "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir. 1990).

MAN Roland also argues that,

> the Department's alleged concerns about using partial-year variance are simply inconsistent with its past practice. The Department's normal practice has always been to calculate labor and overhead costs based on the costs incurred during the six-month investigation period—and not to use costs for longer 'complete' accounting periods.

MAN Roland brief at 32. However, the cases cited by MAN Roland in support of this argument had six-month POIs. In those cases, therefore, Commerce reasonably decided that a six-month variance most accurately approximated the respondents' actual POI experience. In this case, where the POI was two years, Commerce's decision that a six-month variance was not the most accurate approximation of respondents' actual POI experience was reasonable.

MAN Roland also argues that Commerce's decision was not supported by substantial evidence. Specifically, MAN Roland argues, "there was simply no evidence on the record to suggest that MAN Roland's budgets for its 1995–1996 ... projected 'unrealistic capacity utilization levels.'" MAN Roland brief at 31. However, Commerce found that MAN Roland's capacity utilization estimates did not accurately predict actual utilization levels. *See* Cost Verification Report at 3 ("At verification, company officials indicated that MRD's plant capacity is 2.5 million labor hours per year, . . . . Based on actual utiliza-

tion data reported for the period July through December 1995, MRD exceeded its plant capacity by approximately 4.4% during these months."). MAN Roland argues that the fact that "there was simply no evidence on the record to suggest that MAN Roland's budgets for its 1995–1996—which were prepared in the normal course of business ... projected 'unrealistic capacity utilization levels,'" because MAN Roland's capacity utilization was "*even higher*—and its variances even more favorable—than budgeted." MAN Roland brief at 31. Whether MAN Roland's projection understated or overstated its capacity utilization is irrelevant. The fact that the projection was inaccurate supports Commerce's conclusion that MAN Roland's projections are not as reliable as actual historical data.

Commerce appropriately rejected MAN Roland's submitted variance. Therefore, the Court finds, Commerce's decision to adjust MAN Roland's 1996 fiscal year overhead using the actual variance from fiscal year 1995, the most recent fiscal year for which complete information was available, was reasonable.

### 4. *Combining MAN Plamag and MAN Roland Production Costs*

■ In calculating its cost of manufacturing, MAN Roland argues, Commerce should have averaged the labor and overhead rates of MAN Roland's production facility with those of MAN Plamag, MAN Roland's wholly owned subsidiary. MAN Roland contends that,

> [u]nder the Department's established practice, where a respondent has the ability to produce the subject merchandise at two plants, the reported costs should reflect

the weighted-average cost of manufacture at both plants—and not just the costs at the plant where the merchandise was actually produced. The Department has applied this approach in cases where the two facilities are owned by separate subsidiaries of the respondent—as long as the specific merchandise in question can be produced at both plants.

MAN Roland brief at 33.

In the final determination, Commerce said it did not average costs for MAN Roland and MAN Plamag because "MAN Plamag is a separate corporate entity from MRD. Specifically, MAN Plamag is an affiliated party to MRD (not a division or factory within MRD)...." Germany Final at 38, 188.

■ The Court finds Commerce's explanation to be insufficient. In *Certain Fresh Cut Flowers from Colombia*, 55 Fed.Reg. 20,491, 20,497 (Dep't Commerce 1990) (final results admin. review), Commerce agreed to average the costs of production for two related companies.[7] Its position here appears to be at odds with the position it took in that case. "Commerce has the flexibility to change its position providing that it explains the basis for its change and providing that the explanation is in accordance with law and supported by substantial evidence." *Cultivos Miramonte S.A. v. United States*, 21 CIT ——, 980 F.Supp. 1268, 1271 (1997) (footnotes omitted); *see also Hussey Copper, Ltd. v. United States*, 17 CIT 993, 997, 834 F.Supp. 413, 418 (1993)("'This rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of the statute.'")(quoting

**7.** Commerce also argues in its brief, that it did not average MAN Roland's and MAN Plamag's costs because MAN Plamag was not a producer of identical merchandise. *See* Commerce brief at 34–35. However, Commerce did not make this argument in the final determination. Therefore, it represents a post hoc rationalization by agency council. If Commerce chooses to rely upon this argument upon remand, it must reconcile its decision with *Flowers from Colombia*. In that case, Commerce averaged the costs of two companies even though it found that the flowers produced by the two farms were "somewhat different". 55 Fed.Reg. at 20,497. Commerce

also should explain how its decision is consistent with *Silicon Metal from Brazil*. In *Silicon Metal*, Commerce averaged costs incurred at different furnaces in part because "other furnaces used to produce non-subject merchandise *can be used* to produce silicon metal." 59 Fed.Reg. 42,806, 42,-808 (Dep't Commerce 1994) (final results admin. review) (emphasis added). In its brief in this case, however, Commerce argues that "it is irrelevant that MAN Plamag was able to produce LNPPs similar to the custom LNPPs produced by MRD's Augsburg plant and sold during the POI." Commerce brief at 35.

*Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988)). Therefore, the Court is remanding this issue for Commerce to reconsider its decision not to average MAN Roland's costs with MAN Plamag's.

### 5. *Highly Profitable Sales*

In calculating constructed value, Commerce is required to calculate an amount for profit based on the profit margins of sales of a foreign like product made "in the ordinary course of trade." 19 U.S.C. § 1677b(e)(2)(A). MAN Roland argues that in calculating its profit, Commerce should have disregarded certain highly profitable sales. MAN Roland brief at 35–37.

Commerce explained its refusal to exclude such sales from its profit calculation as follows:

> [w]e disagree with respondents that simply because certain home market sales had profits higher than those of numerous other sales, the profits are automatically abnormally high and outside the ordinary course of trade for purposes of computing CV profit. In order to determine that profits are abnormally high, there must be certain unique or unusual characteristics related to the sales in question. However, the respondents have provided no credible information other than the numerical profit amounts to support their contention that certain home market sales had abnormally high profits.

Germany Final at 38,178.

In response, MAN Roland maintains that because Commerce's interpretation confuses the concept "sales with abnormally high profits," with the concept "abnormal sales with high profits," "[Commerce's] interpretation cannot be correct." MAN Roland brief at 36.

■ Although the Court agrees that Commerce's explanation is not a model of clarity, the Court finds Commerce acted within its discretion in including all profitable sales in its calculation of CV profit.

■ *According to the statute, Commerce is to base SG & A and profit on sales made in the ordinary course of trade.* The SAA explains that "... examples of sales that Commerce *could* consider to be outside the ordinary course of trade include sales of off-quality merchandise, sales to related parties at non-arm's length prices, and sales with abnormally high profits." SAA at 839–40 (emphasis added). Thus, Commerce has the discretion to decide under what circumstances highly profitable sales would be considered to be outside of the ordinary course of trade.[8]

In order for Commerce to exclude sales found to have been made *below* the cost of production, the statute requires that Commerce provide additional evidence demonstrating that such sales were actually outside the ordinary course of trade. *See* 19 U.S.C. § 1677b(b)(1). Similarly, Commerce's decision to require additional evidence demonstrating that sales with higher profits were outside of the ordinary course of trade was consistent with the statutory scheme and a reasonable construction of the provision at issue.

### V. United States Price

### 1. *Use of Constructed Export Price*

■ In calculating a dumping margin, Commerce compares United States price to the normal value of the subject merchandise. United States price is calculated using either an export price ("EP") methodology or a constructed export price ("CEP") methodology.[9] Typically, Commerce relies on EP when the foreign exporter sells directly to an unrelated U.S. purchaser. CEP is used

---

**8.** Commerce may not impose this requirement arbitrarily, however, nor may Commerce impose impossible burdens of proof on claimants. *See NEC Home Elecs. v. United States,* 54 F.3d 736, 745 (Fed.Cir.1995) (holding that burden imposed to prove a level of trade adjustment was unreasonable because claimant could, under no practical circumstances, meet the burden).

**9.** Prior to the Uruguay Round Agreements Act, EP sales were designated purchase price sales, while CEP sales were designated as exporter's sales price sales. "Notwithstanding the change in terminology, no change [was] intended in the circumstances under which export price versus constructed export price are to be used." H.R.Rep. No. 103–826(I) at 79 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3851.

when the foreign exporter makes sales through a related party in the United States. *See Sharp Corp. v. United States,* 63 F.3d 1092, 1093–94 (Fed.Cir.1995) ("The statute defines [U.S. price], . . . as either the United States purchase price [now EP] or the exporter's sales price [now CEP], whichever is appropriate. . . . Commerce uses the [CEP] if the foreign manufacturer imports through a related company in the United States.") (citations omitted).

For each of the relevant LNPP sales by MAN Roland to the United States, Commerce calculated U.S. price based on a CEP methodology. MAN Roland argues that two of its sales should have been treated as EP sales.

The antidumping statute defines EP as follows:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States. . . .

19 U.S.C. § 1677a(a). Constructed export price is defined as follows:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the exporter or producer. . . .

19 U.S.C. § 1677a(b).

■ When U.S. price is based on CEP, Commerce bases its calculations on the price charged to the first unaffiliated purchaser. This is the starting price. Commerce then makes certain adjustments including several that are not required for EP sales. The CEP adjustments "are made for certain amounts associated with the sale of merchandise in the United States, typically, commissions for selling the merchandise . . . and sales expenses generally incurred in selling the same type of merchandise in the United States." *PQ Corp. v. United States,* 11 CIT

53, 59, 652 F.Supp. 724, 730 (1987). The purpose of these adjustments is to prevent foreign producers from competing unfairly in the United States market "by spending amounts on marketing and selling their products that are in excess of what they spend in their home markets." *Id.* According to the SAA, "constructed export price is . . . calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers." SAA at 823.

The statute does not specify the circumstances under which Commerce is to choose EP or CEP. However, according to the SAA,

[i]f the first sale to an unaffiliated person in the United States, or to an unaffiliated purchaser for export to the United States, is made by the producer or exporter in the home market prior to the date of importation, then Commerce will base its calculation on export price. If, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter, then Commerce will base its calculation on constructed export price. . . .

*Id.* at 822–23.

■ Thus, a sale to an unaffiliated party made prior to importation and involving a U.S. party affiliated with the producer or exporter could be an EP or a CEP sale. Therefore, in such a situation, "the determination of whether [EP] or [CEP] applies must be based upon additional circumstances." *PQ Corp.* at 60, 652 F.Supp. at 731. In *Certain Stainless Steel Wire Rods from France,* 58 Fed.Reg. 68,865 (Dep't Commerce 1993) (final det.), Commerce described the additional criteria it examines in deciding whether to use an EP or CEP methodology as follows:

The first criterion is that the merchandise in question is shipped directly from the manufacturer to the unrelated buyer, without being introduced into the inventory of the related selling agent. The second criterion is that this arrangement is the customary commercial channel for sales of

this merchandise between the parties involved....

The third criterion is that the related selling agent located in the United States acts only as a processor of sales-related documentation and a communication link with the unrelated U.S. buyer.

*Id.* at 68,868–69. Commerce will apply the EP methodology only if all three criteria apply to the sales at issue. *Id.* at 68,868. This test has been approved by this court. *See Independent Radionic Workers v. United States,* 19 CIT 375, 375 (1995)(describing Commerce's three criteria as "the judicially approved test").

Commerce applied the same criteria in this case, relying on the third criterion in its decision to base U.S. price on CEP.

> MRU's role with respect to the sales at issue is beyond that of a mere "processor of sales documentation" and "communications link." MRU played a major role in the negotiations between MRD and the U.S. customer for the Rochester and Wilkes–Barre sales, ... and incurred significant SG & A expenses in the process. The contractual documentation and sales-related correspondence viewed at verification attests to this fact. Furthermore, we verified that MRU supports MRD's activities in the shipment and installation process relevant to these sales. This is evidenced by the fact that MRU is responsible for the post-sale warehousing of the merchandise shipped from Germany ... as well as the contracting of rigging companies and the sourcing of auxiliary parts essential to the installation process in the United States.

Germany Final at 38,176.

MAN Roland argues that,

> the standard for distinguishing between export price and constructed export price sales is whether the performance of functions by the U.S. subsidiary changes "the substance of the transaction or the functions themselves." In other words, if the functions performed by the U.S. subsidiary could have been performed by the foreign parent, without any participation by the U.S. subsidiary, then the sale should be classified as an export price sale.

MAN Roland brief at 38 (citing *Stainless Steel Hollow Products from Sweden,* 52 Fed. Reg. 37,810, 37,811 (Dep't Commerce 1987) (final det.); *Certain Internal–Combustion, Industrial Forklift Trucks from Japan,* 53 Fed.Reg. 12,552, 12,553 (Dep't Commerce 1988) (final det.)).

> "The evidence in this case demonstrates that all of the functions performed by MRU (MAN Roland's U.S. subsidiary) on the sales to Rochester and Wilkes Barre were routinely performed by its German parent (using unaffiliated local contractors where necessary) for its sales in many of the third-country markets it supplies.... Thus, MAN Roland's sales to Rochester and Wilkes Barre should properly have been treated as 'export price' sales."

MAN Roland brief at 39.

However, as Commerce explained, it is only in cases where the three EP elements are met, that,

> the Department has regarded the routine selling functions of the exporter as "merely having been relocated geographically from the country of exportation to the United States,".... [W]here the functions are performed "does not change the substance of the transactions or the functions themselves."

Germany Final at 38,175 (citing *Forklift Trucks from Japan,* 53 Fed.Reg. at 12,553). Only in such cases will Commerce apply the EP methodology.

 In this case, Commerce provided substantial evidence demonstrating that the third criterion had not been met. Specifically, Commerce examined contractual documentation and sales-related correspondence indicating that MRU "played a major role in the negotiations between MRD and the U.S. customer ... from the bidding stage through to the final contracts...." Germany Final at 38,176. Furthermore, the verification report demonstrates that MRU is responsible for the post-sale warehousing of the merchandise shipped from Germany, the contracting of rigging companies and the sourcing of auxiliary parts necessary for installation. *See* Verification QR. Responses of MRU, N–P Doc. 93 at 17 (post-sale ware-

housing expense); *id.* at 27 (installation costs). Thus, Commerce's decision to rely on CEP rather than EP in calculating U.S. price was appropriate.

### 2. *Further Manufacturing*

█ In calculating MAN Roland's U.S. price, Commerce treated installation of the subject merchandise as further manufacture. According to the statute, CEP is to be reduced by, "the cost of any further manufacture or assembly (including additional material and labor) . . ." 19 U.S.C. § 1677a(d)(2).

MAN Roland maintains that installation expenses for its Wilkes–Barre and Rochester sales should have been treated as movement-related expenses, pursuant to 19 U.S.C. § 1677a(c)(2)(A), which requires Commerce to reduce EP and CEP by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses . . . which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States."

The distinction is significant because Commerce calculates movement-related expenses without imputed profit. Further manufacturing costs, on the other hand, include an imputed profit attributable to the value added by the further manufacturing activities. *See* 19 U.S.C. § 1677a(d) ("For purposes of this section, the price used to establish constructed export price shall also be reduced by . . . (2) the cost of any further manufacture or assembly . . . and (3) the profit allocated to the expenses described in [paragraph] (2))."

MAN Roland argues that Commerce's decision would lead to absurd results because "MAN Roland is able to install LNPPs in distant foreign countries using independent contractors, without any substantial investment in or support from a local subsidiary. . . ." MAN Roland brief at 42. For example, MAN Roland argues, if MAN Roland had decided to install the U.S. sales from Germany using only independent local contractors, without any involvement by its U.S. subsidiary,

the Department would have had to classify the sales as export sales. And . . . no

adjustment could then have been made for further manufacturing costs. . . . The Department then would have been faced with two equally absurd options: It could continue to classify installation costs as further manufacturing costs, and make no adjustment for them at all [ (the statute does not include a further manufacturing deduction for EP sales) ]. Or, alternatively, the Department could hold that the cost of performing installation for such sales should be classified as movement charges . . . even though the costs of performing the identical operations would be classified as further manufacturing when supervised by a U.S. subsidiary.

MAN Roland brief at 42–43.

MAN Roland's hypothetical has no persuasive force. The Court must uphold Commerce's determination if it is in accordance with law and supported by substantial evidence. The statute does not define further manufacture. Therefore, the Court must defer to Commerce's interpretation if that interpretation is reasonable. Here, Commerce explained, it decided to treat installation costs as further manufacturing "because the U.S. installation process involves extensive technical activities on the part of engineers and installation supervisors and the integration of subject and non-subject merchandise necessary for the operation of LNPPs." Germany Final at 38,177. This decision was a reasonable interpretation of the statute. The statute does not require Commerce to analyze costs deducted as CEP costs to determine whether the activities generating such costs would be consistent with an EP transaction. The statute does require that Commerce deduct further manufacturing costs from CEP. Here, Commerce appropriately classified the sales at issue as CEP sales. Thus, Commerce was obligated to deduct the cost of further manufacture. Commerce's decision that the activities at issue here constituted further manufacture was consistent with Commerce's usual practice, which is to classify installation costs as further manufacture where the activities at issue include, "the incorporation of integral, non-subject components during installation or complex installation operations that are

more than mere reassembly. . . ." Germany Final at 38,177.[10] Therefore, the Court finds, Commerce's deduction of MAN Roland's installation costs as further manufacture was in accordance with law.

## VI. Goss's Issues

### 1. *Commerce's Cost Allocation for MAN Roland*

 As explained above, after rejecting MAN Roland's submitted cost figures, based upon the ADK system, Commerce decided to rely on cost estimates prepared by MAN Roland prior to the initiation of the instant investigation. Goss agrees with Commerce's decision to reject the cost information submitted by MAN Roland. However, Goss argues, "Commerce made an error that incorrectly reduced the estimated cost." Goss brief at 11.

Commerce made certain adjustments to the cost estimates by breaking them down into categories (i.e., cost of manufacturing, SG & A, and profit).

"The error arose," explains Goss, "because Commerce had to create a constructed value from two sets of data. . . ." *Id.* at 12. During the investigation, MAN Roland reported actual SG & A costs that Commerce verified. Commerce decided to subtract the estimated SG & A from MAN Roland's estimates, and add in the actual SG & A. The cost estimates did not break out SG & A, so Commerce tried to back the estimated SG & A out of the cost estimates by using the reported SG & A ratio.

The SG & A ratio is used to allocate SG & A costs to individual projects. The ratio is calculated by dividing the total SG & A costs for all projects within a pool by an allocation base, here, total cost of production for all the projects in the pool. The ratio is multiplied by the cost of production of individual projects to calculate the SG & A costs that should be allocated to them. However, Goss explains, in the cost estimates submitted by

MAN Roland to Commerce, the SG & A ratio had been calculated based on a denominator that excluded the cost of purchased parts worth more than DM 500. Goss Brief at 14 (citing MAN Roland Section D response at 27). Commerce multiplied this ratio by the full cost of production for individual projects. Therefore, the subtracted SG & A amounts were inflated. *Id.*

Goss requests that the Court remand this issue so that Commerce may apply the appropriate allocation ratios to MAN Roland's estimated costs. *Id.* at 15. Commerce agrees that it erred in allocating SG & A expenses and also requests a remand so that it may correct its error. Def.'s Mem. Opp. Motion Goss Graphic Systems, Inc., J. Agency Rec. Country/Company–Specific Issues at 14 ("ITA understated the COM because the estimated cost data submitted by MRD did not include the cost of certain parts. . . . Therefore, ITA agrees that the case should be remanded to allow ITA to determine a more accurate cost allocation . . . using the information contained in the administrative record.").

MAN Roland opposes the remand, arguing, "[i]f the Department really had been authorized to rely on 'facts available' in this case, then the choice it made was well within its discretion." Brief of Pls. MAN Roland Druckmaschinen AG and MAN Roland Inc. Opp. Mot. J. Agency Rec. Goss Graphic Sys., Inc. Comp.- and Country–Specific Issues at 10 ("MAN Roland Response Brief").

MAN Roland's argument is flawed, however. Commerce did not make a choice here. Commerce's use of an estimated SG & A ratio based on less than the cost of production was inadvertent. As MAN Roland itself acknowledges, "[a]s a matter of simple arithmetic, the denominator used to calculate an expense rate must be determined on the same basis as the figures to which the rate will be applied." MAN Roland brief at 16.[11]

---

**10.** MAN Roland does not dispute that installation here involved the addition of integral non-subject merchandise.

**11.** MAN Roland made this argument in protesting Commerce's allocation of MRU's indirect selling expenses. In that situation, however, the

Court agreed with Commerce's allocation methodology. Commerce used the same allocation base, i.e. sales value, to calculate the allocation ratio, and to allocate the expenses to individual sales. Commerce simply chose to use a different *pool* of sales—i.e., sales realized rather than sales made—to calculate the ratio. As the Court ex-

In *Koyo Seiko Co. v. United States,* the Court observed that "[t]here can be no doubt that Congress intended final determinations to be precisely that." 14 CIT 680, 682, 746 F.Supp. 1108, 1110 (1990). However, the court added, "failure to reopen a determination which is known to be based on erroneous factual information that would clearly mandate a change in result would itself be arbitrary and capricious." *Id.* at 683, 746 F.Supp. at 1111 (citing *Timken Co. v. United States,* 7 CIT 319, 320 (1984)). *See also Federal–Mogul Corp. v. United States,* 18 CIT 1168, 1171–72, 872 F.Supp. 1011, 1014 (1994) (granting Commerce's request for remand to correct "inadvertent" factual errors).

As in *Koyo Seiko* and *Federal–Mogul,* Commerce's determination here contained a factual error. Therefore, the Court remands this issue so that Commerce may correct it.

2. *The Inclusion of Canadian Expenses in MAN Roland's U.S. Warranty Expenses*

 In calculating CEP for MAN Roland, Commerce deducted an amount for warranty expenses incurred by MRU on subject sales pursuant to 19 U.S.C. § 1677a(d)(1)(B). Section 1677a(d)(1) requires that Commerce reduce CEP by "the amount of any of the following expenses incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise ... (B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties...."

Commerce's normal practice in computing warranty expenses is to use historical data from a four- or five-year period preceding the filing of the petition to estimate the probable warranty expenses on POI sales. *See* Germany Final at 38,184. "The underlying rationale for this practice is the recognition that, in many industries, warranty costs on sales made during the POI might not occur until long after the POI and, consequently, POI sales cannot be tied to their associated actual warranty expenses for reporting purposes." *Id.*

plained, this choice was within Commerce's dis-

Goss does not object to Commerce's use of historical data to calculate warranty expenses. In this case, however, the warranty expense rate reported by MAN Roland and used by Commerce in the final determination, was calculated using both U.S. and Canadian warranty cost data. Goss argues that the warranty expense rate should be recalculated using only U.S. warranty expense data. "Sales to Canadian purchasers are not subject to investigation and warranty expenses on those sales are not directly related to sales in the United States. Therefore, the quoted language prohibits their use in the warranty adjustment to CEP." Goss Brief at 16 (referring to 19 U.S.C. § 1677a(d)(1)).

However, Commerce did not deduct warranty expenses incurred on past Canadian sales or on past U.S. sales. The information about these sales was provided so that Commerce could calculate a warranty *rate* that it applied to the sales under investigation to calculate estimated warranty expenses. Commerce has consistently used respondents' historical warranty data to calculate warranty expenses for subject sales and there is nothing in the statute requiring Commerce to exclude information about third-country sales from such historical data.

In addition, Commerce explained, it did not have sufficient information on the record to segregate the Canadian sales information without distorting its calculation. *See* Germany Final at 38,185. Thus, Commerce's decision to rely on MAN Roland's submitted data was a permissible exercise of Commerce's discretion and consistent with "the basic purpose of the statute: determining current margins as accurately as possible." *Rhone Poulenc, Inc. v. United States,* 8 Fed. Cir. (T) 61, 68, 899 F.2d 1185, 1191 (1990).

Commerce's decision also was supported by substantial evidence. Commerce stated that "the warranty expense rate inclusive of the foreign sales reasonably reflects MRU's actual experience on sales whose warranty period has been completed...." Germany Final at 38,185. On March 13, 1996, MAN Roland submitted information regarding total warranty costs for seven sales made dur-

cretion. *See supra* at 842–844.

ing the four-year period Commerce used to calculate historical warranty costs. The information demonstrates that the average warranty amount calculated by Commerce was consistent with MRU's actual warranty costs on sales for which the entire warranty period fell within the four-year period. *See* MAN Roland's Response to Commerce's Supp. QR., N–P Doc. 81, App. 9.

Thus, the Court finds, Commerce's decision to include warranty costs for third-country LNPP sales was in accordance with law and supported by substantial evidence.

### VII. COMMERCE'S CHOICE OF FACTS AVAILABLE FOR KBA

In the antidumping· petition, Rockwell Graphic Systems, Inc. (now Goss) calculated the margin of dumping for Germany basing United States price (export price) upon the bid price and detailed cost information for a single LNPP sale by MAN Roland to a United States customer, MAN Roland's Rochester sale. *See* Def.'s Mem. Opp. Motion Koenig & Bauer–Albert AG and KBA–Motter Corp. for J. Agency Rec. at 2–3 ("Def.'s KBA Brief"). To calculate an export price, Goss adjusted the bid price by deducting installation charges, foreign and U.S. movement charges, training, a [spare parts allowance] and Customs duties. Goss based these deductions on its own experience, price quotations from suppliers of certain services, and the Harmonized Tariff Schedule of the United States (for customs duties). *See* Petition Imposition of Antidumping Duties, Vol. 2, N–P Doc. 1 at 11 ("Petition"). Goss based normal value on constructed value. Def.'s KBA Brief at 2–3. In calculating normal value, Goss used German costs where available and where German market data was not available, it relied on its own experience. In the petition, Goss estimated the dumping margin for Germany to be 67.67 percent. *Id.* at 3–4.

In estimating the German dumping margin for purposes of the initiation of its antidumping duty investigation, Commerce modified Goss's methodology for calculating constructed value to arrive at an estimated dumping

margin of 46.40 percent. *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan,* 60 Fed.Reg. 38,546, 38,548 (Dep't Commerce 1995) (notice of initiation).

On August 28, 1995, Commerce presented KBA with an antidumping questionnaire. KBA did not respond. In a letter, KBA explained that it produces presses in both Germany and the United States and that it anticipated that future U.S. LNPP sales would be manufactured by KBA's U.S. facility. For that reason, KBA explained, "the expenditure of resources by the KBA Group ... to show that the past sale of a KBA German origin LNPP was not sold at less-than-fair-value is not economically justifiable." Letter of Sept. 25, 1995, N–P Doc. 88 at 3.

In the final determination, based on information supplied by MAN Roland, Commerce again reduced the margin on the sale identified in the petition. MAN Roland's final margin, based on all of its POI sales was calculated to be 30.72 percent. Mem. Re: Alleged Ministerial Errors in the Final Antidumping Duty Margin Calculation—MAN Roland, N–P Doc. 113. Because KBA failed to respond to Commerce's questionnaire, Commerce used facts otherwise available to determine a dumping margin for KBA pursuant to 19 U.S.C. § 1677e. Commerce also determined that KBA had failed to cooperate in the investigation, and that the use of adverse facts available was warranted. *See* Germany Final at 38,167. Commerce assigned to KBA the 46.40 percent margin from the notice of initiation. *Id.*

KBA objects to Commerce's decision to apply the margin from the notice of initiation, modified from the margin alleged in the petition, as facts available. KBA acknowledges that prior to the URAA, the statute gave Commerce great discretion in choosing facts available.[12] KBA also acknowledges that in most respects, the current law is similar to the pre-URAA statute

---

**12.** The terminology has changed. The pre-URAA statute mandated the use of best information available ("BIA") in cases in which a person

refused or was unable to produce information. *See* SAA at 868.

with respect to the use of facts available or BIA. However, KBA argues, "[t]he URAA ... substantively changed U.S. law in one key respect relevant to this appeal." Specifically, KBA argues, "[u]nder the new law, when ITA relies on secondary information as facts otherwise available, ITA must now, to the extent practicable, *corroborate* that information using 'independent sources.'" KBA brief at 11 (citing 19 U.S.C. § 1677e(c)).[13] Secondary information is, among others, information derived from the petition. SAA at 870. "Independent sources may include, for example, published price lists, official import statistics and customs data, and information obtained from interested parties during the particular investigation or review.... Corroborate means that the agencies will satisfy themselves that the secondary information to be used has probative value." *Id.* KBA argues that, "[h]aving decided that the most appropriate proxy for estimating KBA's dumping margin was the margin on the MAN Roland sale alleged in the petition, ITA should have corroborated the margin assigned to KBA with the actual margin ITA calculated for this sale based on the verified data in MAN Roland's final questionnaire response." KBA Brief at 12.

In the final determination, Commerce stated,

"we corroborated all of the secondary information on which the margin in the petition was based during our pre-initiation analysis of the petition to the extent appropriate information was available for that purpose at the time.... For the final determination, we compared the petition price information with verified data on the record and again found that it continued to be of probative value. Nothing in the statute or the SAA compels us to go beyond these procedures."

Germany Final at 38,179–80.

■■■ Commerce is correct. In assigning a dumping margin to KBA, Commerce never decided that MAN Roland's Rochester sale was the most appropriate proxy. Commerce

decided that information from the petition was an appropriate proxy, as it was entitled to do. The information in the petition included some information specific to the Rochester sale, particularly, an approximate bid price. However, the petition also relied on a variety of sources of information including price quotes from suppliers of goods and services, publicly available data appearing in MAN Roland's annual report, publicly available data regarding German market conditions and Goss's own experience. *See* Petition, Vol. 2, at 3–48.

In the absence of information specific to KBA, the sources relied on in Goss's petition were acceptable substitutes. Commerce corroborated all of the information from which the margin was calculated during its pre-initiation analysis, "to the extent appropriate information was available for this purpose at that time." *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany,* 61 Fed.Reg. 8035, 8036 (Dep't Commerce 1996)(prel.det.). After analyzing Goss's data, Commerce made certain adjustments prior to issuing its notice of initiation. Specifically, Commerce excluded all reported depreciation expenses, profit and interest from Goss's calculations. *See* 60 Fed.Reg. at 38,548.

At the preliminary and final determination stages, Commerce corroborated the data that it could not corroborate at the initiation stage—i.e. non-public information specific to MAN Roland—based on information provided by MAN Roland during the investigation.

After comparing MAN Roland's verified data with the petition data, Commerce decided that the data in the petition continued to be of probative value. *See* Memo re: Corroboration of Petition Information, N–P Doc. 69; Memo. re: Corroboration of Petition Information for Purposes of the Final Determination, N–P Doc. 106. This was a reasonable decision. The bid price used by Goss was within two percent of the actual selling price of the LNPP at issue. The total adjustments to the bid price were within 25 percent of the

---

**13.** "When the administering authority or the Commission relies on secondary information rather than on information obtained in the course of an investigation or review, the admin-

istering authority ... shall, to the extent practicable, corroborate that information from independent sources that are reasonably at their disposal." 19 U.S.C. § 1677e(c).

adjustment data provided by MAN Roland and verified by Commerce. Furthermore, Commerce discovered, based on MAN Roland's submission, that although the bid price in the petition tended to overstate the dumping margin, the adjustments tended to understate the margin, thus indicating that Goss had been conservative in its calculations, and that the total discrepancy in export price data, between the petition and MAN Roland's verified data was less than two percent. Thus, the Court finds, Commerce fulfilled its obligation to corroborate secondary information relied on as facts available.

This was not a situation in which Commerce's investigation called into question the publicly available information contained in the petition. *Compare Borden Inc. v. United States,* 4 F.Supp.2d 1221 (CIT 1998) ("[E]ven where the petition is based on apparently reliable public data, if it is called into question by Commerce's investigation, as is the data here, the petition data must be corroborated by data apart from itself."). This is also not a situation in which Commerce has relied on information that has been invalidated. *Compare D & L Supply Co. v. United States,* 113 F.3d 1220, 1223 (Fed.Cir.1997) (deciding under the 1988 version of the antidumping law that "[i]nformation that has conclusively been determined to be inaccurate does not qualify as the 'best information' under any test, and certainly cannot be said to serve the 'basic purpose' [of the statute] of promoting accuracy.").

■ KBA failed to cooperate with Commerce's investigation. Commerce was not obligated to assume that information submitted by MAN Roland was more probative of KBA's experience than the German market data and other information contained in Goss's petition. In fact, Commerce had a right to assume that the petition information was more probative of KBA's experience because if KBA could have submitted information demonstrating that it ought to receive a lower margin, it would have done so.[14] *See Rhone Poulenc,* 8 Fed. Cir. at 67, 899 F.2d at

1190 ("We believe a permissible interpretation of the best information statute allows the agency to make such a presumption [in favor of the use of a higher rather than a lower margin as BIA] and that the presumption is not 'punitive.' Rather, it reflects a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, ... would have produced current information showing the margin to be less.").

Commerce corroborated the information in Goss's petition to the extent required by the statute. Therefore, the Court finds, Commerce's use of that information, and the margin from the notice of initiation was in accordance with law.

### CONCLUSION

For the reasons set out above, Commerce's final determination in *Large Newpaper Printing Presses from Germany* is remanded for Commerce to reconsider its decision not to combine MAN Roland's costs with those incurred by MAN Plamag, and to recalculate MAN Roland's SG & A costs using an appropriate allocation ratio. Commerce's determination is sustained in all other respects.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the Department of Commerce's final determination in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany,* 61 Fed.Reg. 38,166 (Dep't. Commerce 1996) is sustained in part and remanded in part; and it is further

ORDERED that this case is remanded to the Department of Commerce, International Trade Administration to reconsider the decision not to combine MAN Roland's costs with those incurred by MAN Plamag, and to recalculate MAN Roland's SG & A costs using an appropriate allocation ratio; and it is further

---

**14.** In this case, KBA explained that it did not think it would be worthwhile financially to respond to Commerce's questionnaire. However, that does not change the general rule, that where

a respondent fails to participate in an investigation, Commerce may employ adverse inferences about the missing information.

ORDERED that remand results are due on Tuesday, August 4, 1998; comments and responses thereto are due on Tuesday, August 25, 1998; any rebuttal comments are due on Monday, September 7, 1998; and it is further

ORDERED that Commerce's final determination is sustained in all other respects.