226 F.3d 1361 (Fed. Cir. 2000)
 AK STEEL CORPORATION, INLAND STEEL INDUSTRIES, INC.(now Ispat Inland, Inc.), BETHLEHEM STEEL CORPORATION, LTV STEEL COMPANY, INC., NATIONAL STEEL CORPORATION, and U.S. STEEL GROUP, a Unit of USX Corporation, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant- Appellee, and DONGBU STEEL CO., LTD. and UNION STEEL MANUFACTURING CO., LTD., Defendants-Appellees, and POHANG IRON & STEEL CO., LTD., POHANG COATED STEEL CO., LTD.and POHANG STEEL INDUSTRIES CO., LTD., Defendants-Appellees.
 99-1296
 United States Court of Appeals for the Federal Circuit
 REVISED OPINION ISSUED: September 12, 2000
 
 Appealed from: United States Court of International Trade Judge Jane A. RestaniDonald B. Cameron, Kaye, Scholer, Fierman, Hays & Handler, LLP, of Washington, DC, filed a combined petition for panel rehearing and rehearing en banc for defendants-appellees, Dongbu Steel Co., Ltd., et al. With him on the brief representing Dongbu Steel Co., Ltd., were Julie C. Mendoza and Dean C. Garfield. Spencer S. Griffith, Akin, Gump, Strauss, Hauer & Feld, L.L.P., of Washington, DC, represented defendants-appellees, Pohang Coated Steel Co., Ltd., et al. on the brief. With him on the brief representing Pohang Coated Steel Co., Ltd., were Sukhan Kim and Sydney H. Mintzer.
 Michael H. Stein, Dewey Ballantine LLP, of Washington, DC, filed a response for plaintiffs-appellants, AK Steel Corporation, et al. With him on the response wereBradford L. Ward, Jennifer Danner Riccardi, and Paul A. Christodoulou. Of counsel were Joon Peter Kim and Andrew John Conrad.
 Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, filed a response for defendant-appellee, United States. With him on the response were David W. Ogden, Assistant Attorney General; and David M. Cohen, Director. Of counsel on the response were John D. McInerney, Acting Chief Counsel; Elizabeth C. Seastrum, Senior Counsel; and William G. Isasi, Attorney, Office of Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.
 Before MICHEL, PLAGER, and LOURIE, Circuit Judges.
 
 ORDER
 
 1
 A combined petition for rehearing and suggestion for rehearing en banc having been filed by appellees Dongbu Steel Co., Ltd., et al., and Pohang Iron & Steel Co., Ltd. et al., and responses thereto having been invited by the court and filed by appellants and the United States[1]
 
 Upon consideration thereof, it is
 
 2
 ORDERED that the petition for rehearing be granted for the limited purpose of clarifying this court's opinion.
 
 
 3
 IT IS FURTHER ORDERED that the previous opinion of the court in this appeal is withdrawn. The new opinion accompanies this order.
 
 
 4
 IT IS FURTHER ORDERED that the suggestion for rehearing en banc is declined.
 
 
 5
 The mandate of the court will issue on September 19, 2000.
 
 
 6
 MICHEL, Circuit Judge.
 
 
 7
 AK Steel Corporation, Inland Steel Industries, Inc., Bethlehem Steel Corporation, LTV Steel Company, Inc., National Steel Corporation, and U.S. Steel Group (collectively "domestic producers" or "appellants") appealed to this court the judgment of the United States Court of International Trade in this anti-dumping duties case. The International Trade Administration, United States Department of Commerce ("Commerce") issued a decision: (1) using a three-part test it adopted informally in 1987 to determine whether certain sales to U.S. buyers of Korean steel by U.S. affiliates of the Korean producers[2] were properly classified as Export Price ("EP") sales rather than Constructed Export Price ("CEP") sales, as defined in 19 U.S.C. § 1677a(a)-(b) (1994) and (2) declining to apply the "fair-value" and "major-input" provisions of 19 U.S.C. § 1677b(f)(2)-(3) (1994) to transfers among affiliated steel producers in Korea that it had treated as one entity for purposes of the anti-dumping determination. As a consequence of these methods and their application, the duty rates were minimal. The domestic producers then filed suit challenging these methods as contrary to the anti-dumping statute. The trial court, however, upheld Commerce's decision and its methods as consistent with the statute. See AK Steel Corp. v. United States, 34 F. Supp. 2d 756 (Ct. Int'l Trade 1998). This court, in an opinion issued February 23, 2000, held that the three-part test employed by Commerce is contrary to the express terms defining EP and CEP in the anti-dumping statute as amended in 1994 and therefore reversed-in-part and remanded for a redetermination of the anti-dumping duties. See AK Steel Corp. v. United States, 203 F.3d 1330 (Fed. Cir. 2000). As to the fair-value and major-input provisions we held that Commerce's decision not to apply those provisions to the transactions in suit was reasonable and within its discretion, and its method consistent with the statute, and therefore we affirmed-in-part. Id. The Korean producers then filed a petition for rehearing and suggestion for rehearing en banc. Because the Korean producers raised statutory questions that were not raised in the briefs or at oral argument, the panel took the case on reconsideration to address the statutory arguments. This opinion addresses the Korean producers' statutory arguments; however, the outcome of the case is unchanged.
 
 BACKGROUND
 
 8
 In 1993 Commerce issued an order imposing anti-dumping duties on certain steel products from Korea. See Certain Cold Rolled Steel Flat Products from Korea, 58 Fed. Reg. 44,159 (Dep't of Commerce 1993) (hereinafter "Certain Steel Products from Korea"). In August of 1995 both the domestic producers and the Korean producers requested an administrative review of that anti-dumping duty order. In its second administrative review of the anti-dumping duty order, Commerce classified all of the sales of the subject merchandise at issue in this appeal[3] as EP sales rather than CEP sales pursuant to 19 U.S.C. § 1677a(a)-(b) (1994). See Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea, 62 Fed. Reg. 18,404, 18,434 (Dep't of Commerce 1997) (hereinafter "Final Results"). In addition, because Commerce had collapsed POSCO and its affiliates, POCOS and PSI, into one entity for purposes of assigning dumping margins, Commerce opted not to apply the so-called "fair-value" and "major-input" provisions to transactions among those companies. Id. at 18,430.
 
 I.
 
 9
 In calculating dumping margins, Commerce compares the "U.S. Price" to the "normal value" of the subject merchandise and imposes anti-dumping duties if, and to the extent, the former is lower than the latter. The U.S. Price is calculated using either the EP or CEP methodology. In general, Commerce applies the EP methodology to a sale when the foreign producer or exporter sells merchandise directly to an unrelated purchaser located in the United States. Commerce applies the CEP methodology when the foreign producer's or exporter's steel is sold to an unaffiliated U.S. buyer by a producer-affiliated company located in the United States. If the sale is classified as a CEP sale, additional deductions are taken from the sales price to arrive at the U.S. Price.[4] The statute defines EP and CEP as follows:
 
 
 10
 (a) Export PriceThe term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .
 
 
 11
 (b) Constructed Export Price
 
 
 12
 The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . .
 
 19 U.S.C. § 1677a(a)-(b).[5]
 
 13
 For the sales of steel produced by each of the appellees challenged here, Commerce calculated the U.S. Price based on an EP classification. In determining whether to classify the sales here as EP or CEP, Commerce applied a three-part test (the "PQ Test") that it developed on a remand from an unrelated 1987 case, PQ Corp. v. United States, 652 F. Supp. 724, 733-35 (Ct. Int'l Trade 1987). An agency interpretation of 19 U.S.C § 1677a(a)-(b), the test has been applied when a foreign manufacturer's affiliated entity in the United States makes a sale to an unaffiliated U.S. purchaser prior to import, as in the case of the sales at issue here. Using the PQ Test, Commerce classifies sales made by U.S. affiliates as EP sales if the following criteria are met:
 
 
 14
 (1) the subject merchandise was shipped directly from the manufacturer to the unrelated buyer, without being introduced into the inventory of the related shipping agent;
 
 
 15
 (2) direct shipment from the manufacturer to the unrelated buyer was the customary channel for sales of this merchandise between the parties involved; and
 
 
 16
 (3) the related selling agent in the United States acted only as a processor of sales-related documentation and a communication link with the unrelated U.S. buyer.
 
 
 17
 See, e.g., Certain Stainless Steel Wire Rods from France, Final Determination of Sales at Less than Fair Value, 58 Fed. Reg. 68,865, 68,868-69 (Dep't of Commerce 1993).
 
 
 18
 All of the sales at issue in the present case were "back-to-back" sales: the Korean producer sold the steel to an affiliated Korean exporter; the exporter sold it to its U.S. affiliate; and finally, the U.S. affiliate sold it to the unaffiliated U.S. purchaser. In most cases, however, the steel was shipped directly to the unaffiliated purchaser without entering the inventory of the U.S. affiliate. In the second administrative review, whether the sales of steel manufactured by the Korean producers satisfied the third prong of the PQ Test was one of the principal factual issues in dispute. In classifying the sales at issue, Commerce rejected the domestic producers' argument that the activities of the Korean exporter's U.S. affiliates failed the third prong of the test because they "exceed[ed] those of a mere communications link or processor of documents." Final Results, 62 Fed. Reg. at 18,432.
 
 II.
 
 19
 Commerce "collapsed" POSCO and its related companies, POCOS and PSI, into one entity for purposes of the anti-dumping analysis and then levied a single anti-dumping duty on the entity. In the second administrative review, Commerce determined that "a decision to treat affiliated parties as a single entity necessitates that transactions among the parties also be valued based on the group as a whole . . . . [Thus] among collapsed entities, the fair-value and major-input provisions are not controlling." Final Results, 62 Fed. Reg. at 18,430. Therefore, in its 1995 review, Commerce declined to treat the transfers between the related companies as sales between affiliates, but rather treated them as transfers between divisions of the same company and did not apply the fair-value and major-input provisions of 19 U.S.C. § 1677b(f)(2)-(3).
 
 
 20
 The domestic producers challenged the Final Results by filing suit in the Court of International Trade, calling illegal the PQ Test and its application to appellees, the decision to collapse the POSCO affiliates, and the determination that the fair-value and major-input provisions did not apply to transfers among the collapsed companies. The Court of International Trade sustained Commerce's Final Results, holding the PQ Test to be a reasonable interpretation of the statute and the application in this case to be sustainable. In addition the court held that the decisions to collapse the affiliated producers and not apply the fair-value and major-input provisions were within the agency's discretion. See AK Steel, 34 F. Supp. 2d at 762, 764-66. The domestic producers timely appealed to this court those portions of the judgment based on statutory interpretation, challenging the legality of the PQ Test and the decision not to apply the fair-value and major-input provisions, assuming the affiliates were properly collapsed. This court issued an opinion on February 23, 2000 reversing the trial court's decision upholding the PQ Test and affirming its decision upholding Commerce's decision to collapse the Korean producers and their affiliates. AK Steel, 203 F.3d 1330.
 
 
 21
 The Korean producers filed a timely petition for rehearing and suggestion for reconsideration en banc with this court. In that petition the Korean producers argued, for the first time, that language in the URAA implementing act rendered the Statement of Administrative Action ("SAA") submitted to Congress with the URAA a judicially binding interpretation of the agreement and the implementing statute. The panel granted the motion for reconsideration to more fully address the SAA.
 
 
 22
 This court has jurisdiction under 28 U.S.C. § 1295(a)(5) (1994).
 
 DISCUSSION
 I. Standard of Review
 
 23
 Appellants challenge neither the application of the PQ Test to the sales by the various Korean producers at issue in this case nor the reasonableness of Commerce's decision to "collapse" the affiliated Korean companies into one entity. Thus, no facts are in dispute and the only issues before us are: (1) whether the Court of International Trade erred in concluding that Commerce's PQ Test is a correct, or at least a reasonable, interpretation of ambiguous terms of the statute; and (2) whether it erred in holding that the decision not to apply the fair-value and major-input provisions to transactions among collapsed entities was within Commerce's discretion.
 
 
 24
 "In reviewing the Court of International Trade, this court decides de novo the proper interpretation of governing statutory provisions." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994). When reviewing statutory interpretation by an agency charged with implementing a statute by rulemaking and adjudication, as is the Commerce Department here, see Suramerica de Aleaciones Laminadas v. United States, 966 F.2d 660, 665 & n.5 (Fed. Cir. 1992), we are guided by the Supreme Court's decision in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984), which requires the court to ask two questions. Under Chevron, the court first asks whether Congress has made an express or implied delegation to the agency or if it has "directly spoken to the precise question at issue." Id. If it has not made any delegation to the agency, then courts and the agency "must give effect to the unambiguously expressed intent of Congress." Id. If Congress has not spoken unambiguously on the precise issue, and thus made at least an implied delegation to the agency, then the court must ask Chevron's second question and determine whether the interpretation of the statute by the agency charged with implementing it is a reasonable one. See id. The core issue in this appeal is whether Congress itself drew the line between EP and CEP sales, or left it to Commerce to do so.
 
 II. PQ Test
 
 25
 The Court of International Trade held that the PQ Test did not contradict the statute as amended. The court found that the test was "simply a means to determine whether the sale at issue for anti-dumping duty purposes is in essence between the exporter/producer and the unaffiliated buyer, in which case the EP rules apply." AK Steel, 34 F. Supp. 2d at 762 (emphasis added). The domestic producers argue that Commerce's PQ Test conflicts with the unambiguously expressed intent of Congress because the statute and legislative history make clear that a sale by any producer-affiliated seller in the United States to an unrelated U.S. buyer must be classified as CEP. The appellees argue, however, that the statute is ambiguous about how to classify those sales that occur before importation but that are made by producer-affiliated entities in the United States. Therefore, according to appellees, the PQ Test is an appropriate methodology for determining whether EP or CEP classification is applied to those sales.
 
 
 26
 The language of the statute must be viewed in context. The U.S. Price used in making anti-dumping determinations is meant to be the sales price of an arm's-length transaction between the foreign producer and an unaffiliated U.S. purchaser. The U.S. Price is derived from either EP or CEP sales. To isolate an arm's-length transaction under the current statute, Commerce looks to the first sale to a purchaser that is not affiliated with the producer or exporter. If the producer or exporter sells directly to the U.S. purchaser, that sale is used because it is considered an arm's-length transaction. In that situation the sale is classified as EP.[6] If, however, the first sale to an unaffiliated purchaser occurs in the United States, then that sale must be used to determine the U.S. Price. Such a sale will be classified as a CEP sale and have additional deductions made to account for certain expenses of the seller in the United States.[7] The purpose of these additional deductions in the CEP methodology is to prevent foreign producers from competing unfairly in the United States market by inflating the U.S. Price with amounts spent by the U.S. affiliate on marketing and selling the products in the United States. In the administrative review process, the foreign producers submit to Commerce the information about sales to unaffiliated purchasers. Those sales must be classified as either: (1) between an unaffiliated U.S. purchaser and the producer or exporter, and thus EP; or (2) between the unaffiliated U.S. purchaser and another entity in the United States that must, by definition, be related to the producer, and thus CEP. Sales in the United States between unaffiliated purchasers and unaffiliated sellers are never at issue; such a sale could never be the first sale to an unaffiliated purchaser.
 
 
 27
 The question at the root of this appeal is whether a sale to a U.S. purchaser can be properly classified as a sale by the producer/exporter, and thus an EP sale, even if the sales contract is between the U.S. purchaser and a U.S. affiliate of the producer/exporter and is executed in the United States. Appellees argue that it can, if the role of the U.S. affiliate is sufficiently minor that the sale passes the PQ Test. The domestic producers argue that the plain language of the statute prevents such a classification. We agree with the domestic producers.
 
 
 28
 Commerce's three-part PQ Test and much of the Court of International Trade case law reviewing it were created before the enactment of the URAA in 1994. Prior to the URAA, "purchase price" (now EP) was described as:
 
 
 29
 the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.
 
 
 30
 19 U.S.C. § 1677a(b) (1988). The "exporter's sales price" (now CEP) was defined as:
 
 
 31
 the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter.
 
 
 32
 19 U.S.C. § 1677a(c) (1988). The amendments to the statute most relevant to this issue are the addition of the phrase "outside the United States" to the definition of EP, and "by a seller affiliated with the producer" to the definition of CEP. Thus, the 1994 statute reads:
 
 
 33
 (a) Export Price
 
 
 34
 The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .
 
 
 35
 (a) Constructed Export Price
 
 
 36
 The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . .
 
 
 37
 19 U.S.C. § 1677a(a)-(b).
 
 
 38
 Despite these changes to the definitions of EP and CEP, the SAA submitted to Congress with the URAA states that the statutory changes did not alter the "circumstances under which export price (formerly purchase price) versus constructed export price (formerly exporter's sales price) are used." H.R. Rep. No. 103-316, vol. 1 at 822 (1994),reprinted in 1994 U.S.C.C.A.N. 3773, 4163. This panel was aware of the SAA when it prepared its original opinion, now withdrawn. Prior to a petition for panel rehearing none of the parties brought to the court's attention, however, that in the statute itself, Congress declared that the SAA is to be considered
 
 
 39
 an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.
 
 
 40
 19 U.S.C. § 3512(d). When confronted with a change in statutory language, we would normally assume Congress intended to effect some change in the meaning of the statute. See, e.g., Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1367 (Fed. Cir. 1998) ("A change in the language of a statute is generally construed to import a change in meaning. . . ."). Here, however, the SAA prevents us from making such an assumption and we have revised our opinion primarily to address the authoritative weight given the SAA in the statute.
 
 
 41
 The PQ Test arises from Commerce's interpretation of the pre-1994 statutory language. In interpreting the pre-1994 statute, the Court of International Trade in PQ Corporation focused on whether there was an affiliate relationship between the foreign producer and the U.S. importer as the primary factor enabling Commerce to differentiate between the two sales classifications. In response to Commerce's argument that there was no statutory requirement that "the importer must be an independent party in order to apply [EP]," the court held that:
 
 
 42
 [w]hile the statute does not state in so many words that [purchase price] and [exporter's sales price] are to be distinguished by the relationship of the foreign producer to the U.S. importer, the statutory definitions of [purchase price] and [exporters sales price] have been distinguished upon this basis from their inception . . . . The express terms of the statute make it clear that a U.S. importer's relationship to a foreign producer will affect the determination of whether [purchase price] or [exporter's sales price] will apply.
 
 
 43
 PQ Corp., 652 F. Supp. at 732-33 (emphasis added). Despite the Court of International Trade's emphasis on the relationship between the importer and the foreign producer, however, the test developed by Commerce after the remand in PQ Corporation actually does not directly examine the legal relationship between the producer and the importer, but rather seeks to determine the role played by the importer in the transaction. The agency continued to apply the test after the statute was amended in 1994.
 
 
 44
 We are confronted here with a complex statutory interpretation task. The language of the old and new statutes is not identical, yet it is apparently intended to be applied to the same effect in the same "circumstances." The court opinion in PQ Corporation interpreting the old version of the statute relies on the legal relationship between an exporter and importer, while the test developed by the agency in response to that interpretation examines the role the importer plays in the transaction. Confronted with these potential contradictions, we start by examining the current statute, as it is the clearest and most current expression of congressional intent.
 
 A. 1994 Statute
 
 45
 Read without reference to the old statutory language, the plain meaning of the language enacted by Congress in 1994 focuses on where the sale takes place and whether the foreign producer or exporter and the U.S. importer are affiliated, making these two factors dispositive of the choice between the two classifications.
 
 
 46
 The text of the 1994 definition of CEP states that CEP is the "price at which the subject merchandise is first sold in the United States." 19 U.S.C. § 1677a(a) (emphasis added). In contrast, EP is defined as the price at which the merchandise is first sold "outside the United States." 19 U.S.C. § 1677a(b). Thus, the location of the sale appears to be critical to the distinction between the two categories. Appellees, however, point to a decision of the Court of International Trade holding that the words "outside the United States" were ambiguous, finding that it was unclear whether they described the location of the sale or the location of the producer/exporter. See Mitsubishi Heavy Indus., Ltd. v. United States, 15 F. Supp. 2d 807, 812 (Ct. Int'l Trade 1998). We do not perceive the same ambiguity. In any event, the trial court's decision is not binding on us.
 
 
 47
 When the EP definition is read in conjunction with the CEP definition, the alleged ambiguity in the EP definition disappears. The language of the CEP definition leaves no doubt that the modifier "in the United States" relates to "first sold." The term "outside the United States," read in the context of both the CEP and the EP definitions, as it must be, applies to the locus of the transaction at issue, not the location of the company. Therefore, the critical differences between EP and CEP sales are whether the sale or transaction takes place inside or outside the United States and whether it is made by an affiliate. A sales contract executed in the United States between two entities domiciled in the United States cannot generate a sale "outside the United States." Thus, if "outside the United States" refers to the sale, as the appellees argues in this appeal, one of the parties to the sale or the execution of the contract must also be "outside the United States" for an EP classification to be proper.[8]
 
 
 48
 Accordingly, the conclusion of the Mitsubishi court, that the phrase "outside the United States" ambiguously modifies either the sale or the producer/exporter, is incorrect. In general, a producer/exporter in a dumping investigation will always be located outside the United States. Thus, it must be the locus of the transaction that is modified by "outside the United States" in the EP definition for otherwise the description of the producer/exporter would be pure surplusage. Of course, whether a sale is "outside the United States" depends, in part, on whether the parties are or are not located in the United States. A transaction, such as those here, in which both parties are located in the United States and the contract is executed in the United States cannot be said to be "outside the United States." Thus, such a transaction cannot be classified as an EP transaction. Rather, classification as an EP sale requires that one of the parties to the sale be located "outside the United States," for if both parties to the transaction were in the territory of the United States and the transfer of ownership was executed in the United States, it is not possible for the transaction to be outside the United States.
 
 
 49
 In the Final Results, Commerce attempted to circumvent this geographic restriction on the use of EP sales by stating that when the PQ Test was satisfied it "consider[ed] the exporter's selling functions to have been relocated geographically from the country of exportation to the United States, where the [U.S. affiliate] performs them." The trial judge's holding that the PQ Test does not contradict the statute because it is a means of defining whether a sale is "in essence" between a producer/exporter and the unaffiliated buyer suggests the same point. But it is not a valid point because it departs from the factors Congress put in the statute. As discussed above, the plain language of the EP definition precludes classification of a sale between two U.S. entities (i.e., a U.S. affiliate of the producer and a U.S. purchaser) as an EP sale. Thus, the "relocation" concept produces a result that is contrary to the plain language of the statute.
 
 
 50
 In addition, the Court of International Trade decision in PQ Corporation precludes "relocation" of selling activity by holding that the "statute provides no mechanism for imputing actual sales by an importer to that importer's related 'foreign manufacturer or producer of the merchandise' so that [purchase price (now EP)] will apply." PQ Corp., 652 F. Supp. at 733. Thus, Commerce's decision to redefine the activities occurring inside the United States as occurring outside the United States makes an impermissible end-run around both the plain meaning of the statutory language and the mandate of the Court of International Trade in PQ Corporation. Congress has made a clear distinction between the two categories based on the geographic location of the transaction; the agency may not circumvent this geographic distinction by "relocating" the activities of the producer/exporter.
 
 
 51
 Similarly, the statute also distinguishes the categories based on the participation of an affiliate as the seller. The definition of CEP includes sales made by either the producer/exporter or "by a seller affiliated with the producer or exporter." 19 U.S.C. § 1677a(b). EP sales, on the other hand can only be made by the producer or exporter of the merchandise. See 19 U.S.C. § 1677a(a). Consequently, while a sale made by a producer or exporter could be either EP or CEP, one made by a U.S. affiliate can only be CEP. Limiting affiliate sales to CEP flows logically from the geographical restriction of the EP definition, as a sale executed in the United States by a U.S. affiliate of the producer or exporter to a U.S. purchaser could not be a sale "outside the United States." The location of the sale and the identity of the seller are critical to distinguishing between the two categories.
 
 
 52
 Congress provided for only two mutually exclusive categories: EP or CEP sales. In distinguishing the two, Congress opted for what can be seen as a structural approach to defining EP and CEP sales, not the function-driven approach of the PQ Test. Congress chose clear and unambiguous words such as "affiliated," "sold," and "in" or "outside" the United States. In no sense did it leave the distinguishing factor to the agency to identify. When, as here, there are contracts showing that the sales at issue took place in the United States between two entities with United States addresses, one of which was an affiliate of the producer/exporter, it is contrary to the plain meaning of the statute for Commerce to nevertheless use the PQ Test to define the sales as effectively occurring outside of the United States, and thus EP sales rather than CEP sales.
 
 
 53
 The sales contracts in evidence plainly prove that the sales to the unaffiliated U.S. purchasers were made by affiliates of the foreign producers or exporters that are located in the United States. If the importer and the producer/exporter are affiliated, then the first sale to an unaffiliated party is necessarily the sale between the affiliated importer and the unaffiliated purchaser (unless there is another intermediate U.S. affiliate involved, which would have no effect on the analysis). Thus, the sales at issue fall squarely within the definition of CEP as articulated in the 1994 version of the statute.
 
 
 54
 The Korean producers argue that it is the question of who is the seller that is left unresolved by the statute. Because the terms "seller" and "sold" are undefined in the statute, they are therefore ambiguous, assert the Korean producers. Thus, they argue, this court should accord Chevron deference to the PQ Test because Commerce properly developed the test to determine if the U.S. affiliate is indeed a "seller," based on the affiliate's activities. We, however, are not persuaded that this language in the statute is ambiguous.
 
 
 55
 When a word is undefined in a statute, the agency and the reviewing court normally give the undefined term its ordinary meaning. See Perrin v. United States, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Black's Law Dictionary (6th ed. 1990) defines "seller" as "one who has contracted to sell property . . . the party who transfers property in the contract of sale." As to "sold," this court previously addressed the meaning of that term in the definition of the Exporter's Sales Price (now CEP). See NSK Ltd. v. United States, 115 F.3d 965, 973 (Fed. Cir. 1997). In that case we defined "sold" to require both a "transfer of ownership to an unrelated party and consideration." Id. at 975 (emphasis added). We see no reason to depart from those definitions, and therefore hold that the "seller" referred to in the CEP definition is simply one who contracts to sell, and "sold" refers to the transfer of ownership or title. Since there can be no real ambiguity about these terms, contrary to the assertions of the appellees, we are not required to do any analysis under the second part of the Chevron test. Rather than impliedly delegating the task of distinguishing between the two types of sales to the agency, Congress did so right in the statute.
 
 
 56
 The sales activities of the U.S. affiliates of the Korean producers or exporters clearly meet these definitions, as evidenced by the contracts for sales between the U.S. affiliates and the U.S. purchasers. The record in this appeal is not disputed; it was the U.S. affiliates of the Korean producers that contracted for sale with the unaffiliated U.S. purchasers. The title or ownership passed from the U.S. affiliate to the unaffiliated U.S. purchaser. There were no contracts between the Korean producers and the unaffiliated U.S. purchasers. Thus, the U.S. affiliates were the "sellers," as indicated by the plain language of the statute. Commerce does not require a cumbersome test, examining the activities of the affiliate, to determine whether or not the U.S. affiliate is a seller, when the answer to that question is plain from the face of the contracts governing the sales in question. If Congress had intended the EP versus CEP distinction to be made based on which party set the terms of the deal or on the relative importance of each party's role, it would not have written the statute to distinguish between the two categories based on the location where the sale was made and the affiliation of the party that made the sale.
 
 
 57
 Congress's intent to fully define EP and CEP without any delegation to Commerce is further evident when the sections are viewed in the context of the rest of the anti-dumping statute. It is common in the anti-dumping statute for Congress to leave decisions about how to make dumping calculations to Commerce's discretion because of its expertise. (See, for example the discretionary use of the so-called fair-value provision discussed infra.) Accordingly, if Congress had intended for Commerce to use its discretion to determine whether the use of CEP or EP was appropriate, it would have explicitly left that task to the agency as it did with other calculations in the statute.
 
 
 58
 When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.[9] Normally, having determined that the agency's test employs terms that are contrary to those in the statute, our analysis would stop. In this case, however, we are confronted with the SAA, which Congress has stated provides a guide to authoritative interpretation of the statute.
 
 B. The Statement of Administrative Action
 
 59
 Here, despite the plain meaning of the amended language of the statute, the SAA that accompanied the URAA declares that the "[n]ew section 772 retains the distinction in existing law between 'purchase price' (now called the 'export price') and 'exporters sales price' (now called the 'constructed export price')." The SAA goes on to state that "[n]otwithstanding the change in terminology, no change is intended in the circumstances under which export price . . . versus constructed export price . . . are used." H.R. Rep. No. 103-316, vol. 1 at 822 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4163. Appellees cite to the SAA as evidence of congressional intent to endorse the PQ Test as a proper interpretation of the new statutory language. We, however, do not so interpret the SAA.
 
 
 60
 First, the PQ Test is hardly consistent with the pre-1994 statute, read as a whole. Prior to the 1994 amendments, the statute required only that "purchase price" sales be made "prior to the date of importation" without any explicit reference to where the sales had occurred. 19 U.S.C. § 1677a(b) (1988). The "exporters sales price" (now CEP), however, was defined, as it is today, as the "price at which merchandise is sold or agreed to be sold in the United States." 19 U.S.C. § 1677a(c) (1988). Thus, the distinction based on the location of the sale was already present, although less complete, in the prior version of the statute. Use of the PQ Test to "relocate" the sales activity from the producer/exporter to the U.S. affiliate therefore appears inconsistent with the pre-1994 statutory language for the same reasons it is inconsistent with the language of today's statute. In addition, the legislative history of the earliest versions of the anti-dumping statute also indicates that Congress traditionally distinguished between EP and CEP based on the presence of an affiliate in the United States. For example, in hearings before the Senate Committee on Finance discussing sections 203 and 204 of the Antidumping Act of 1921, the equivalent of an EP classification was said to apply if "the merchandise is sold by the foreign seller to an American purchaser having no interest in the business of the foreign seller." Emergency Tariff and Antidumping: Hearings on H.R. 2435. Before the Senate Comm. on Finance, 67th Cong. at 11 (1921). In the same hearings, the Exporters Sales Price (or CEP) was said to apply if "the merchandise is sold, by a foreign seller having an interest in the American purchasing agency." Id.
 
 
 61
 Second, this court has never endorsed the PQ Test as a proper interpretation of the pre-1994 statute. Prior to this case, this court has never considered the legality of the test, much less held that the test is a reasonable interpretation of an ambiguous statute. In fact, when describing the EP/CEP distinction, this court has repeatedly relied on the affiliate relationship between the producer/exporter and the importer. See, e.g., NSK Ltd., 115 F.3d at 968 ("[T]he United States price will be the exporter's sales price [now CEP] if the importer and exporter are related."); Sharp Corp. v. United States, 63 F.3d 1092, 1094 (Fed. Cir. 1995) ("Commerce uses the ESP [now CEP] if the foreign manufacturer imports through a related company in the United States."). In cases heard prior to the amendments, however, the Court of International Trade did approve application of the test that resulted in a purchase price (now EP) classification despite the fact that a U.S. affiliate processed the orders. See, e.g., Independent Radionic Workers of Am. v. United States, 19 C.I.T. 375 (1995) ("[T]he subsidiary was simply a conduit performing ministerial duties as to the sales at issue."); Zenith Elec. Corp. v. United States, 18 C.I.T. 870 (1994); E.I. DuPont de Nemours & Co. v. United States, 841 F. Supp. 1237, 1250 (1993). Nevertheless, in light of this court's earlier statements on the EP/CEP distinctions and Congress's clarification of the statute in 1994, we do not find the Court of International Trade's endorsement of the PQ Test to reflect an accurate interpretation of the pre-1994 statute.
 
 
 62
 Furthermore, in situations where the Court of International Trade has reviewed the application of the PQ Test after the 1994 amendments, it has only upheld applications that resulted in the sales in question being classified as CEP sales, rather than as EP sales. See, e.g., Mitsubishi, 15 F. Supp. 2d at 815; U.S. Steel Group v. United States, 15 F. Supp. 2d 892, 903 (Ct. Int'l Trade 1998); Koenig & Bauer-Albert AG v. United States, 15 F. Supp. 2d 834, 853 (Ct. Int'l Trade 1998). Until this case, the Court of International Trade was not confronted with EP classification of a sale in the United States by an affiliate. In addition, the Court of International Trade itself has expressed reservations about the test, admonishing "[t]his is not an easily administrable test and the court suggests that Commerce attempt to draw some sharper lines." U.S. Steel Group, 15 F. Supp. 2d at 903.
 
 
 63
 Finally, there is no indication in the legislative history that Congress intended to retain the PQ Test upon amending the statute because the test is nowhere mentioned. The Korean producers correctly argue that Congress is presumed to know the administrative or judicial interpretation given a statute when it adopts a new law incorporating the prior law. See Lorillard v. Pons, 434 U.S. 575, 580-81 (1978). Lorillard, however, is limited to those situations where Congress "enacts a statute without change." See id. at 580. Here we cannot ignore the fact that Congress indeed changed the language of the statute, particularly because the changes are directly at odds with the PQ Test. If Congress had intended to endorse the PQ Test it would not have undercut the test by adding the clarifying language to the statute in 1994.
 
 
 64
 Our review of the pre-1994 statute and the 1994 amendments reveals language that is consistent, although clearer in the amended version. Since the amendment, recent court interpretations of the statute and review of the PQ Test have also been consistent in interpreting the statute to require CEP classification when a U.S. affiliate is doing the selling. Indeed, the addition of the word "affiliated" to the CEP sales definition in the 1994 amendments is entirely consistent with the relationship-based distinction first articulated by the Court of International Trade in PQ Corporation and repeatedly stated by this court. Similarly, the logical interpretation of Congress's addition in 1994 of the words "outside the United States" to the definition of an EP sale is that Congress intended to codify the traditional distinction between the EP and CEP. The addition of these terms merely echoed the interpretation given by the Court of International Trade in PQ Corporation and reinforced the language in the statute prior to the 1994 amendment by emphasizing that the critical question was not the role of the affiliate in the sale but the legalrelationship between the seller and the producer/exporter, i.e., whether the U.S. importer is an affiliate of the foreign producer. Since the amendments in 1994, there has been no judicial endorsement of the use of the PQ Test to "relocate" the sales activities of the exporters to their U.S. affiliates. Despite earlier endorsement of the test by the Court of International Trade, we find nothing in the pre-1994 statute or the SAA to indicate that Congress intended that the distinction between EP and CEP to be based on the activities of the importer rather than the legal relationship between the importer and the producer/exporter. Thus, we will not now hold the SAA to be an endorsement of an agency interpretation that is inconsistent with the plain language of the current statute, particularly where it is clear to us that the test was never consistent with the statute or congressional intent.
 
 
 65
 Accordingly, we hold that if the contract for sale was between a U.S. affiliate of a foreign producer or exporter and an unaffiliated U.S. purchaser, then the sale must be classified as a CEP sale. Stated in terms of the EP definition: if the sales contract is between two entities in the United States, and executed in the United States and title will pass in the United States, it cannot be said to have been a sale "outside the United States"; therefore the sale cannot be an EP sale. Similarly, a sale made by a U.S. affiliate or another party other than the producer or exporter cannot be an EP sale. Thus, we reverse the decision of the Court of International Trade and remand to that court (for remand, if necessary, to the Department of Commerce) for a redetermination of anti-dumping duties that is consistent with this holding.
 
 
 66
 III. Application of the Fair-Value and Major-Input Provisions
 
 
 67
 Commerce deemed three affiliated Korean producers, POSCO, POCOS and PSI, to be a single entity for its dumping analysis and levied a single anti-dumping duty on the entire group of related companies (a process referred to as "collapsing"). See Final Results, 62 Fed. Reg. at 18,430. Because it considered the separate companies as one entity, rather than separate though related companies, Commerce did not "disregard" the transaction prices among the group members and apply "fair-value" prices instead when determining the constructed value.[10] The so called "fair-value" provision is described in 19 U.S.C. § 1677b(f)(2):
 
 
 68
 A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.
 
 
 69
 19 U.S.C. § 1677b(f)(2) (emphasis added).
 
 
 70
 Similarly, because the POSCO companies were "collapsed" into a single entity, Commerce did not apply the major-input provision of 19 U.S.C. § 1677b(f)(3):
 
 
 71
 If, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).
 
 
 72
 19 U.S.C. § 1677b(f)(3) (emphasis added).
 
 
 73
 While the domestic producers contested the collapsing of POSCO and POCOS below, they do not do so here. Thus, the only question before this court is whether, once duly collapsed, it was permissible for Commerce, in the exercise of its discretion, not to apply the provisions of 19 U.S.C. § 1677b(f)(2) & (3) to underlying transactions between those companies. In the earlier administrative review of this anti-dumping action and in other similar actions, Commerce applied the fair-value and major-input provisions despite collapsing several entities into one.[11] In this second review, however, Commerce concluded that application of those provisions was unwarranted, if not unlawful, because "a decision to treat affiliated parties as a single entity necessitates that transactions among the parties also be valued based on the group as a whole." Final Results, 62 Fed. Reg. at 18,430.
 
 
 74
 "Affiliated" persons are defined in the statute as those directly or indirectly owning five percent or more of the voting shares of an organization or two or more persons controlled by or controlling a common person. See 19 U.S.C. § 1677(33)(E) & (F) (1994). The domestic producers argue that collapsing for purposes of levying a single anti-dumping duty does not erase corporate form; thus POSCO and POCOS are "affiliated persons" under the statute, and Commerce should still have applied the fair-value and major-input provisions. Appellees argue, and the Court of International Trade upheld Commerce's determination, that once they have been collapsed, POSCO, POCOS and PSI need no longer be treated as affiliated companies, but rather should be treated as one entity for all anti-dumping determination purposes. We may or may not agree that to do so is necessary or wise, but it cannot be fairly said to be an abuse of discretion.
 
 
 75
 When analyzing transfers between divisions of the same company Commerce need not and does not apply the fair-value or major-input provisions. See Certain Forged Steel Crankshafts from the United Kingdom, 61 Fed. Reg. 54,613, 54,614 (Dep't of Commerce 1996). Thus, it is not unreasonable for Commerce to decide not to apply those provisions to affiliates that are properly treated as one company for the balance of the anti-dumping analysis. Both provisions only apply to transactions "between . . . persons"; once Commerce has decided to treat the companies as one "person" for purposes of the anti-dumping analysis, it is not statutorily required to apply the provisions.
 
 
 76
 Indeed, the domestic producers' argument that the statute requires the application of the provisions even to affiliates that were not treated as one entity is contrary to the plain language of the statute, which merely provides that Commerce "may" determine the values in a manner other than the use of the transfer price. Thus, the statute leaves possible application of the fair-value and major-input provisions to the discretion of the agency, such that Commerce could decline to apply those provisions even if the POSCO producers were considered separate affiliates rather than one entity. We therefore affirm the decision of the Court of International Trade insofar as it upholds Commerce's decision not to apply the fair-value and major-input provisions.
 
 CONCLUSION
 
 77
 The judgment of the Court of International Trade is, accordingly
 
 
 78
 AFFIRMED-IN-PART, REVERSED-IN-PART and REMANDED.
 
 COSTS
 
 79
 Each party to bear its own costs.
 
 
 
 NOTES:
 
 
 [1]
 Although the United States was an appellee in the original appeal before this court and was not a prevailing party in the decision issued by the court, the United States did not join the petition for rehearing and suggestion for rehearing en banc. In response to the panel's invitation to file a brief on the issue presented for reconsideration, the United States urged the court not to grant the petition for rehearing or the suggestion for rehearing en banc.
 
 
 [2]
 Dongbu Steel Co., Ltd. ("Dongbu"), Union Steel Manufacturing Co., Ltd. ("Union"), Pohang Iron & Steel Co., Ltd. ("POSCO"), Pohang Coated Steel Co., Ltd. ("POCOS") and Pohang Steel Industries Co., Ltd. ("PSI") are referred to collectively as the "Korean producers" or "Korean manufacturers" throughout this opinion.
 
 
 [3]
 Certain other sales were classified as CEP sales. No challenge was raised to those classifications in the Court of International Trade.
 
 
 [4]
 The classification of the sales impacts the determination of the dumping margin because the statute provides for certain deductions from CEP that are not deducted from EP. Specifically, commissions for selling, any expenses from the sale (such as credit expenses), the cost of further manufacture, and the profit allocated to those costs and expenses must be deducted from CEP sales. See 19 U.S.C. § 1677a(d). Therefore, use of CEP is more likely to result in a determination of dumping.
 
 
 [5]
 The administrative review at issue in this appeal was initiated after the effective date of the 1994 amendments to the anti-dumping laws contained in the Uruguay Round Agreement Act ("URAA"). Thus, the statute as amended by the URAA applies to this case.
 
 
 [6]
 We note that the statute appears to allow for a sale made by the foreign exporter or producer to be classified as a CEP sale, if such a sale is made "in the United States." 19 U.S.C. 1677a(a). No such transaction is at issue in this appeal.
 
 
 [7]
 The text of the statute provides that the CEP price should be reduced by
 the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added) --
 (A) commissions for selling the subject merchandise in the United States;
 (B) expenses that result from, and bear a direct relationship to, the sale such as credit expenses, guarantees and warranties;
 (C) any selling expenses that the seller pays on behalf of the purchaser; and
 (D) any selling expenses not deducted under subparagraph (A), (B), or (C).
 19 U.S.C. § 1677a(d) (1994).
 
 
 [8]
 While we can hypothesize a sales contract between two U.S. domiciled entities that is entirely executed outside the United States, we make no determination regarding whether such a sale would be classified as an EP or CEP sale.
 
 
 [9]
 Whether, in the absence of the two statutory definitions, the PQ Test does or does not allow Commerce to make accurate dumping determinations is not something this court need address. We do note, however, that in this case Commerce appears to have used the test to go far beyond not only the intent of Congress but even the language of Commerce's own test. According to the Final Results and the lower court decision, warehousing, marketing, extension of credit to customers, and the processing of warranty claims were all considered merely "acting as a processor of sales-related documentation" in accordance with part three of the PQ Test. This seems absurd. Thus, under the current use of the PQ Test, significant expenses incurred in the U.S. are being included in the U.S. Price used in dumping calculations. This demonstrates a further flaw in the test: because it is poorly defined, it allows sales that are far beyond anything contemplated by Congress to be classified as EP sales.
 
 
 [10]
 The constructed value is meant to create a proxy for the foreign market price by summing up the cost of inputs, processing, and other relevant factors.
 
 
 [11]
 That Commerce changed its interpretation, however, need not change the court's analysis. See Chevron, 467 U.S. at 863 (initial agency interpretation is not "carved in stone").