259 F.3d 1341 (Fed. Cir. 2001)
 KOENIG & BAUER-ALBERT AG and KBA-MOTTER CORPORATION, Plaintiffs,
and
MAN ROLAND DRUCKMASCHINEN AG and MAN ROLAND INC., Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee,
and
GOSS GRAPHICS SYSTEMS, INC., Defendant-Appellee.
 00-1387
 United States Court of Appeals for the Federal Circuit
 DECIDED: August 9, 2001
 
 Appealed from: United States Court of International Trade Judge Donald C. Pogue Jeffrey M. Winton, Shearman & Sterling, of Washington, DC, argued for plaintiffs-appellants MAN Roland Druckmaschinen AG, et al. With him on the brief was Thomas B. Wilner. Of counsel was Perry S. Bechky.
 Timothy C. Brightbill, Wiley, Rein & Fielding, of Washington, DC, argued for defendant-appellee. Goss Graphics Systems, Inc. With him on the brief were Charles Owen Verrill, Jr., and Alan H. Price. Of counsel was John R. Shane.
 James H. Holl, III, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee United States. With him on the brief were David M. Cohen, Director; and Velta A. Melnbrencis, Assistant Director. Of counsel on the brief was David W. Richardson, Attorney, Office of Chief Counsel for Import Administration, Department of Commerce, of Washington, DC. Of counsel were Peter G. Kirchgraber, Berniece A. Browne, and John D. McInerney, Attorneys, Department of Commerce.
 Before CLEVENGER, RADER, and GAJARSA, Circuit Judges.
 RADER, Circuit Judge.
 
 
 1
 The United States Court of International Trade sustained the United States Department of Commerce's results of an antidumping duty investigation on all but one issue, which is not on appeal here, and remanded for further determination. Koenig & Bauer-Albert AG v. United States, 15 F. Supp. 2d 834 (Ct. Int'l Trade 1998) (Koenig I). The Court of International Trade later sustained Commerce's remand results. Koenig & Bauer-Albert AG v. United States, 90 F. Supp. 2d 1284 (Ct. Int'l Trade 2000) (Koenig II). Because the Court of International Trade used a test that has since been held invalid by this court in determining that the subject sales were Constructed Export Price (CEP) sales, this court vacates the Court of International Trade's determination on that issue and remands. This court affirms the Court of International Trade's decision to sustain Commerce's Constructed Value (CV) profit calculation.
 
 I.
 
 2
 MAN Roland Druckmaschinen AG (MRD) and MAN Roland Inc. (collectively MAN Roland) manufacture and sell large newspaper printing presses (LNPPs). Because LNPPs are large and complex, MRD, a German company, does not fully assemble in Germany those presses intended for sale in the United States. Rather, MRD ships them through MAN Roland Inc., a United States affiliate of MRD, which assembles them at the customers' locations in the United States.
 
 
 3
 During the period at issue, MAN Roland sold two LNPPs in the United States. At the request of domestic producer Goss Graphics Systems, Inc., Commerce investigated the two sales and assessed MAN Roland antidumping duties. Commerce made three determinations relevant to this appeal: (1) the two sales were CEP sales; (2) costs incurred during installation of the LNPPs were "further manufacturing" costs; and (3) all profitable home-market sales could be included in the CV profit calculation. Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany, 61 Fed. Reg. 38,166 (Dep't Commerce July 23, 1996).
 
 
 4
 On appeal to the Court of International Trade, MAN Roland argued that its two sales were Export Price (EP) sales, rather than CEP sales. The Court of International Trade applied the so-called "PQ Test", developed by the Court of International Trade in PQ Corp. v. United States, 652 F. Supp. 724, 733-35 (Ct. Int'l Trade 1987), and sustained Commerce's finding that the sales were CEP sales. Koenig I, 15 F. Supp. 2d at 850-53. MAN Roland also argued that Commerce should have adjusted the duties under 19 U.S.C. § 1677a(c)(2)(A) (1994) because costs incurred during installation were movement expenses. The Court of International Trade sustained Commerce's finding that the installation expenses were further manufacturing under § 1677a(d)(2). Specifically, the trial court noted that MAN Roland incorporated integral non-subject components and performed complex installation operations beyond mere reassembly. Koenig I, 15 F. Supp. 2d at 853-54. Finally, MAN Roland argued that Commerce should have excluded one of its foreign sales from the CV calculation because that sale had an abnormally high profit margin and was thus outside the ordinary course of trade. The Court of International Trade sustained Commerce's inclusion of the sale because Commerce reasonably exercised its discretion in requiring additional evidence to establish that the sale was outside the ordinary course of trade. Id. at 850. MAN Roland appeals. This court has jurisdiction under 28 U.S.C. § 1295(a)(5) (1994).
 
 II.
 
 5
 The Court of International Trade reviews Commerce's decision for substantial evidence on the record or errors of law. 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). This court reapplies the exact same review. Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed. Cir. 1984). But see Zenith Elecs. Corp. v. United States, 99 F.3d 1576, 1579-85 (1996) (Rader, J., concurring) (questioning the Atlantic Sugar standard of review).
 
 
 6
 In calculating dumping margins, Commerce compares the "normal value" of the subject merchandise to either the EP or CEP and imposes antidumping duties if, and to the extent, the normal value exceeds the EP or CEP. 19 U.S.C. § 1673 (1994). The statute defines EP and CEP as follows:
 
 
 7
 (a) Export price. The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser . . . .
 
 
 8
 (b) Constructed export price. The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . .
 
 
 9
 19 U.S.C. § 1677a(a)-(b) (1994). Before this court's decision in AK Steel Corp. v. United States, 226 F.3d 1361 (Fed. Cir. 2000), Commerce used the PQ Test to determine whether a sale before importation through a United States affiliate of the producer was an EP or CEP sale. Id. at 1365. Under that test, even if the United States affiliate was involved in the sale to the United States purchaser, depending on the degree of that involvement, Commerce could still classify the sale as EP. Id. This court in AK Steel held the PQ Test invalid, finding title 19 to require that "while a sale made by a producer or exporter could be either EP or CEP, one made by a U.S. affiliate can only be CEP." Id. at 1371 (emphasis added). This court further defined the term "sold" in § 1677a(b) as follows: "We . . . hold that the `seller' referred to in the CEP definition is simply one who contracts to sell, and `sold' refers to the transfer of ownership or title." Id. at 1371.
 
 
 10
 MAN Roland and the government seek a remand for Commerce to reconsider whether the sales were EP or CEP in light of AK Steel. Because neither Commerce nor the Court of International Trade has considered this issue since AK Steel, this court vacates the Court of International Trade's decision on this issue and remands with instructions to remand to Commerce. Commerce will then have the opportunity to make appropriate findings to classify properly MAN Roland's sales in light of the AK Steel decision.
 
 
 11
 MAN Roland also argues that the Court of International Trade erroneously affirmed Commerce's treatment of installation costs as "further manufacturing" under § 1677a(d)(2), rather than movement expenses under § 1677a(c)(2)(A). However, costs under § 1677a(d)(2) only reduce the export price if it is CEP, not EP. On remand Commerce will reconsider under the statutory interpretation of AK Steel whether the sales were EP or CEP. As MAN Roland has pointed out and the Court of International Trade has acknowledged, neither the Court of International Trade nor Commerce fully considered the proper treatment of the installation costs if the sales were determined to be EP sales, rather than CEP sales. Koenig I, 15 F. Supp. 2d at 853. If Commerce determines on remand that the sales are EP sales, the proper treatment of the installation costs may change. This court thus declines to address this issue, thereby allowing Commerce to reconsider the proper treatment of these costs on remand if it determines that the sales are EP sales, rather than CEP sales.
 
 
 12
 Finally, MAN Roland argues that Commerce should have excluded one of its foreign sales from the CV calculation because it was outside the ordinary course of trade. Commerce uses "the actual amounts incurred and realized by the specific exporter or producer . . . in the ordinary course of trade" to calculate profit for CV. 19 U.S.C. § 1677b(e)(2)(A) (1994) (emphasis added). "The term `ordinary course of trade' means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1994). In its CV calculation, Commerce included all five profitable home market sales made by MAN Roland. The profit margins on these sales were 0.59%, 2.53%, 13.00%, 5.05%, and 58.39%. Thus, Commerce derived a weighted average of 6.03%. MAN Roland argues that because the 58.39% sale had a much higher profit margin than the other profitable sales, it was not in the ordinary course of trade. Thus, according to MAN Roland, Commerce should have excluded the 58.39% sale from its calculation.
 
 
 13
 The Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 656 (1994) (SAA), accompanying the Uruguay Round Agreements Act is instructive on this issue. The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d) (1994). The SAA provides several exemplary types of sales that could be outside the ordinary course of trade, including "sales with abnormally high profits." SAA, H.R. Doc. No. 103-316, vol. 1, at 840. However, the SAA only states that Commerce "may" or "could" consider such sales to be outside the ordinary course of trade. Id. at 839-40. The use of "may" and "could" indicates that high profits alone are not enough to establish that the sales are outside the ordinary course of trade. Such permissive language also indicates that Commerce has discretion in determining which sales were outside the ordinary course of trade. Commerce reasonably exercised that discretion by requiring MAN Roland to produce evidence in addition to the profit margin to establish that the 58.39% profit sale was outside the ordinary course of trade. MAN Roland did not produce any such evidence. Accordingly, Commerce reasonably exercised its discretion when it did not exclude the 58.39% profit sale from the CV calculation.
 
 CONCLUSION
 
 14
 This court vacates the Court of International Trade's determination under the PQ Test that the sales were CEP sales. This court remands that issue with instructions for the Court of International Trade to remand it to Commerce so that Commerce can decide in the first instance under this court's AK Steel decision whether the sales are CEP or EP sales. This court declines to address whether MAN Roland's installation costs are further manufacturing or movement expenses because neither the Court of International Trade nor Commerce considered the proper treatment of the installation costs if the sales were EP sales, rather than CEP sales. Because the Court of International Trade correctly sustained Commerce's CV profit calculation, this court affirms the Court of International Trade's determination of that issue.
 
 COSTS
 
 15
 Each party shall bear its own costs.
 
 
 16
 AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED